# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE VIACOM INC. | ) | **CONSOLIDATED** |
| STOCKHOLDERS LITIGATION | ) | **C.A. No. 2019-0948-JRS** |

## MEMORANDUM OPINION

Date Submitted: September 15, 2020
Date Decided: December 29, 2020

Gregory V. Varallo, Esquire of Bernstein Litowitz Berger & Grossmann LLP, Wilmington, Delaware; Jeroen van Kwawegen, Esquire, Edward G. Timlin, Esquire, Andrew E. Blumberg, Esquire and Daniel E. Meyer, Esquire of Bernstein Litowitz Berger & Grossmann LLP, New York, New York, Attorneys for Lead Plaintiff California Public Employees' Retirement System.

Chad Johnson, Esquire, Noam Mandel, Esquire and Desiree Cummings, Esquire of Robbins Geller Rudman & Dowd LLP, New York, New York; Christopher H. Lyons, Esquire of Robbins Geller Rudman & Dowd LLP, Nashville, Tennessee, Attorneys for Additional Plaintiff Park Employees' and Retirement Board Employees' Annuity and Benefit Fund of Chicago.

Francis A. Bottini, Jr., Esquire and Anne B. Beste, Esquire of Bottini & Bottini, Inc., La Jolla, California, Attorneys for Additional Plaintiff Louis M. Wilen.

Matthew E. Fischer, Esquire, Michael A. Pittenger, Esquire, Christopher N. Kelly, Esquire, J. Matthew Belger, Esquire, Jacqueline A. Rogers, Esquire and Callan R. Jackson, Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware and Victor L. Hou, Esquire, Rahul Mukhi, Esquire and Mark E. McDonald, Esquire of Cleary Gottlieb Steen & Hamilton LLP, New York, New York, Attorneys for Defendants National Amusements, Inc., NAI Entertainment Holdings LLC, and Shari E. Redstone.

Gregory P. Williams, Esquire, Blake Rohrbacher, Esquire and Kevin M. Regan, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware and Robert H. Baron, Esquire, Gary A. Bornstein, Esquire and Rory A. Leraris, Esquire of Cravath, Swaine & Moore LLP, New York, New York, Attorneys for Defendants Thomas J. May, Judith A. McHale, Ronald Nelson and Nicole Seligman.

Jon E. Abramczyk, Esquire, D. McKinley Measley, Esquire, Alexandra M. Cumings, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware and Stuart J. Baskin, Esquire and Randall Martin, Esquire of Shearman & Sterling LLP, New York, New York, Attorneys for Defendant Robert M. Bakish.

**SLIGHTS, Vice Chancellor**

Delaware's General Corporation Law is a prime example of codified law that "elegant[ly] and flexibl[y]" enables those it regulates to fulfill their vital and multi-faceted purposes.[1]  As a "counterpoint" to the DGCL's enabling and contractarian features, "the *ex post* judicial review of the actions of corporate officers and directors, measured by fiduciary principles" exists as a means to ensure that those charged with the management of the corporation act with a loyal purpose "when exercising their broad powers over corporate property and processes."[2] This *ex post* judicial review is presumptively deferential in recognition of both the managerial primacy of the board of directors, as provided for in the DGCL, and the prudence of encouraging managerial "creativity and risk-taking."[3]  Indeed, for these reasons, as a general matter, the conduct of corporate fiduciaries is given less judicial scrutiny than the conduct of trust fiduciaries.[4]  But courts of equity, where judicial review of fiduciary conduct abides, have long been on *qui vive* for the self-dealing fiduciary who steers the corporation into transactions that enrich the fiduciary to the

---

[1] William T. Allen, Jack B. Jacobs and Leo E. Strine, Jr., *Function Over Form: A Reassessment of Standards of Review in Delaware Corporation Law*, 56 Bus. L. Rev. 1287, 1289 (Aug. 2001) (hereinafter "*Function Over Form*").

[2] *Id.*

[3] Leo E. Strine, Jr., *The Delaware Way: How We Do Corporate Law and Some of the Challenges We (and Europe) Face*, 30 Del. J. Corp. L. 673, 675 (2005) (hereinafter "*The Delaware Way*").

[4] *Function Over Form*, at 1289.

potential detriment of the stockholders.[5] In these instances, "the duty of loyalty is rigorously enforced by requiring the [fiduciaries] to justify as intrinsically fair any transaction in which they had a financial interest."[6]

"Consistent with the nuance that infuses our common law, Delaware is more suspicious when the fiduciary who is interested [in a transaction] is a controlling stockholder."[7] Thus, this court is, and should be, skeptical when a controlling stockholder seeks a pleading stage dismissal of breach of fiduciary duty claims brought on behalf of public stockholders who challenge the *bona fides* of a transaction where the controller indisputably stands on both sides of the transaction.[8] Indeed, when a controlling stockholder engages in self-dealing, she should assume, if challenged, that the court will perform its "*ex post* review" function with vigor,

---

[5] *Id.* at 1290 (noting that duty of loyalty claims, addressing primarily claims involving self-dealing, are the fiduciary duty claims with "the longest pedigree").

[6] *Id.*

[7] *The Delaware Way*, at 678 (explaining that, "[w]hen that is so, there is an obvious fear that even putatively independent directors may owe or feel a more-than-wholesome allegiance to the interests of the controller, rather than to the corporation and its public stockholders").

[8] Lewis H. Lazarus, Brett M. McCartney, *Standards of Review in Conflict Transactions on Motions to Dismiss: Lessons Learned in the Past Decade*, 36 Del. J. Corp. L. 967, 998–99 (2011) (reviewing the interaction between the plaintiff-friendly standard of review embodied in Court of Chancery Rule 12(b)(6) and the standards of review applied in Delaware to adjudicate breach of fiduciary claims in the corporate context, and observing that dismissals of complaints challenging transactions where the controller "stands on both sides" of a transaction are extraordinary).

2

and that it will generally allow public stockholders who might challenge the self-dealing transaction an opportunity to proceed beyond the pleadings to test the fairness of the transaction.[9] This case, involving one of the more visible, hotly contested instances of alleged controlling stockholder self-dealing in recent memory, is no exception.[10]

A putative class of Viacom Inc. stockholders allege that the controlling stockholders of both Viacom and CBS Corporation, defined below as the NAI

---

[9] That the court allows a plaintiff to take discovery in support of his claims does not mean the court has fixed the standard of review for all time come what may. *See Orman v. Cullman*, 794 A.2d 5, 31 (Del. Ch. 2002) ("Reaching this decision with regard to the loyalty of the Board that approved the merger, however, does not rebut the business judgment presumption at this stage of the litigation. It merely means that the business judgment presumption may not be used as the basis to dismiss Orman's fiduciary duty claims for failure to state a cognizable claim. Further discovery is necessary to determine whether the facts—as they truly existed at the time of the challenged transaction, rather than those accepted as necessarily true as alleged—are sufficient to rebut the business judgment rule presumption and to trigger an entire fairness review.").

[10] Of course, our Supreme Court has drawn a "road map" for those engaged in transactions with conflicted controlling stockholders to earn business judgment deference at the pleading stage for all fiduciaries involved in the transaction. *See Kahn v. M&F Worldwide Corp.*, 88 A.3d 635 (Del. 2014) ("*MFW*") (holding that breach of fiduciary duty claims arising out of a squeeze-out merger conditioned from the outset upon both the negotiation and approval of a fully empowered independent special committee of the board *and* the uncoerced, fully informed vote of a majority of the minority stockholders in support of the transaction will be reviewed under the business judgment rule), *overruled in part*, *Flood v. Synutra Int'l, Inc.*, 195 A.3d 754 (Del. 2018); *Flood*, 195 A.3d at 770 (affirming trial court dismissal of a complaint under Chancery Rule 12(b)(6) where defendants had clearly complied with the *MFW* dual protections); In re Martha Stewart Living Omnimedia, Inc. S'holder Litig., 2017 WL 3568089, at *18 (Del. Ch. Aug. 18, 2017) (describing the dual-protections laid out in *MFW* as a "road map" for fiduciaries to earn business judgment review of their conduct in approving transactions with conflicted controllers).

3

Parties, caused Viacom and CBS to merge and become the combined entity now known as ViacomCBS, Inc. (the "Merger"). According to Plaintiffs, the NAI Parties are controlled by Shari Redstone ("Ms. Redstone"). Ms. Redstone is alleged to have exerted her control over other Viacom fiduciaries in a manner that caused them to negotiate and approve the Merger out of loyalty to her on terms detrimental to Viacom and its public stockholders.[11]

Plaintiffs' complaint spins a tale of Ms. Redstone's unrelenting drive to attain the status of "media magnate" that would rival or surpass the legacy of her father, Sumner Redstone. According to Plaintiffs, in 2016, Ms. Redstone initiated a campaign to consolidate the media empire her father had built. Her first step was to augment her control of the NAI Parties. She then attempted to leverage her control of the NAI Parties to cause the entities they controlled, Viacom and CBS, to merge on three separate occasions, in 2016, 2018, and then again (successfully) in 2019. In 2016 and 2018, when her attempts to effect a Viacom/CBS combination failed, she took steps to remove the obstacles and tried again.

---

[11] In an interesting twist, a putative class of CBS stockholders have brought a separate lawsuit in this Court in which they allege that CBS fiduciaries, including the NAI Parties, breached their fiduciary duties by causing CBS to merge with Viacom on terms unfair to CBS. *See In re CBS Corp. S'holder Class and Deriv. Action*, C.A. No. 2020-0111-JRS. The CBS fiduciaries have moved to dismiss that consolidated action and the Court expects to issue its opinion addressing those motions shortly.

In 2018, Ms. Redstone convinced an allegedly compromised Viacom transaction committee to push for a merger with CBS (for the second time), but her insistence that Viacom CEO and alleged NAI loyalist, Robert Bakish, be named to the board of the *pro forma* company prompted CBS to reject the deal and stop talking. Undeterred, Ms. Redstone was back again in 2019, pushing the same conflicted Viacom transaction committee to push the same transaction that CBS had rejected the year before, but this time she insisted that CBS agree that Bakish would not only have a seat on the board but also be named CEO of the *pro forma* company. CBS sensed that Ms. Redstone's fixation on installing her compatriot Bakish as CEO of the combined company could be exploited, and its special committee insisted that Viacom make a commensurate "significant concession" on price in exchange for its governance priorities. The Viacom transaction committee did just that, ultimately agreeing to accept approximately $1 billion less in the Merger than it had bargained for just a year before.

Plaintiffs bring breach of fiduciary duty claims against the NAI Parties, Bakish and the members of Viacom's transaction committee for their role in consummating the Merger. Each defendant has moved to dismiss the complaint. In doing so, they urge the Court to review Plaintiffs' breach of fiduciary duty claims under the deferential business judgment rule since Plaintiffs have alleged nothing more than that the NAI Parties stood on both sides of the merger. According to

5

Plaintiffs, a controller's mere presence on both sides of a transaction is not enough to trigger entire fairness review; Plaintiffs must also well plead that the controller exploited its control position to the tangible detriment of the minority stockholders.

Citing the seminal *Weinberger v. UOP, Inc.*,[12] Plaintiffs maintain that the Defendants' position plainly misstates Delaware law, which has, for decades, recognized that, "[t]he requirement of fairness is **unflinching** in its demand that where one stands on both sides of a transaction, he has the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts."[13] According to Plaintiffs, the controller's presence on both sides of a transaction is "inherently coercive" with respect to other corporate decision makers, and entire fairness scrutiny, therefore, is required to gauge whether the transaction replicated what would have been secured for the corporation and its stockholders at arms-length. Alternatively, Plaintiffs argue their complaint more than adequately pleads that the NAI Parties, and Ms. Redstone in particular, secured value from the Viacom/CBS Merger that was not shared with other Viacom stockholders.

The parties' fundamental disagreement over the supposedly settled state of our law regarding whether the controller's "mere presence" on both sides of a merger

---

[12] 457 A.2d 701 (Del. 1983).

[13] *Id.* at 710 (emphasis added).

6

is enough to trigger entire fairness review is interesting to be sure, but ultimately academic. After carefully reviewing the complaint, I am satisfied it adequately pleads a reasonably conceivable basis to infer that the controller achieved a non-ratable benefit from the Merger to the detriment of Viacom's public stockholders. Thus, at this stage, and without prejudice to Defendants' right to argue otherwise on a more developed record, I am satisfied that NAI's conduct with respect to the Merger should be reviewed for entire fairness.

NAI could have agreed to the *MFW* dual protections to avoid entire fairness review but explicitly directed the special committees of both Viacom and CBS to proceed on the assumption that NAI would not agree to allow the minority stockholders of either company to decide whether to proceed with the Merger. If implemented, the dual protections provided to minority stockholders under the *MFW* framework would have sufficiently neutralized the NAI Parties coercive influence over the process.[14] Absent these protections, a conflicted controller

---

[14] *Tornetta v. Musk*, 2019 WL 4566943, at *12 (Del. Ch. Sept. 20, 2019) (observing that "*MFW*'s 'dual protections' are meant to 'neutralize' the conflicted controller's 'presumptively coercive influence' so that judicial second-guessing is no longer required" (quoting *In re Rouse Prop., Inc.*, 2018 WL 1226015, at *1 (Del. Ch. Mar. 9, 2018))). To be clear, I am not suggesting that the NAI Parties' refusal to agree to implement the *MFW* protections is indicative of fiduciary wrongdoing. It is not. But the lack of *MFW* dual protections does render pleading stage business judgment deference unavailable to the NAI Parties if Plaintiffs have well pled that they were controlling stockholders who were conflicted with respect to the Merger. And, as discussed below, Plaintiffs have carried that pleading burden.

7

standing on both sides of a transaction cannot avoid entire fairness review of that transaction. Here, the complaint well pleads that the Merger was not entirely fair. It follows, then, that the motion to dismiss the claims against the NAI Parties must be denied.

Plaintiffs also assert claims against the members of Viacom's transaction committee who negotiated the transaction on Viacom's behalf and recommended its approval, alleging these fiduciaries not only maintained relationships with Ms. Redstone that conceivably compromised their independence, but also labored under a "controlled mindset" that caused them to succumb to the will of the controller. In other words, Plaintiffs allege that the willingness of the fiduciaries who served on Viacom's transaction committee to allow Ms. Redstone to dominate their decision-making rendered them servile tools in Ms. Redstone's relentless pursuit of a Viacom/CBS combination to advance her interests. Thus, notwithstanding the Section 102(b)(7) provision in Viacom's charter,[15] Plaintiffs

---

[15] *See* 8 *Del. C.* § 102(b)(7) (enabling Delaware corporations to adopt a provision in their certificate of incorporation, "eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (i) For any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under § 174 of this title; or (iv) for any transaction from which the director derived an improper personal benefit").

8

maintain they have stated viable, non-exculpated claims against each member of the Viacom transaction committee.

For reasons explained below, I agree with Plaintiffs that their complaint states non-exculpated breach of loyalty claims against the members of the Viacom transaction committee. The well-pled facts relating to the controller's past predations, her direct involvement in Merger negotiations and her relationships with the members of the Viacom transaction committee are enough to allow pleading-stage inferences that these fiduciaries did not act independently and in the best interests of Viacom's minority stockholders when negotiating and ultimately consummating the Merger. Thus, notwithstanding the exculpation clause in Viacom's charter, the motion to dismiss the claims against these defendants must also be denied.

The same cannot be said of the motion to dismiss brought by Bakish. Regardless of the applicable standard of review, our law requires that a plaintiff plead a factual basis to support a claim of breach of fiduciary duty. In other words, the complaint must put the fiduciary on notice of what he is alleged to have done wrong. Given that not a single allegation in the complaint alleges actionable wrongdoing by Bakish, the claim against him, as set forth in Count III, must be dismissed.

# I. BACKGROUND

I have drawn the facts from well-pled allegations in the Verified Class Action Amended Complaint (the "Complaint") and documents incorporated by reference or integral to that pleading.[16] For purposes of the motion, as I must, I accept as true the Complaint's well-pled factual allegations and draw all reasonable inferences in Plaintiffs' favor.[17]

## A. The Parties and Relevant Non-Parties

Non-party, Viacom, was a publicly traded Delaware corporation headquartered in New York, New York.[18] Viacom provided entertainment-related services and products through its primary business units, Viacom Media Networks and Paramount Pictures.[19] In addition to feature films released by Paramount Pictures, Viacom was well known for its cable channels, including MTV, BET, VH1, Nickelodeon and Comedy Central.[20] Viacom featured a dual-class stock structure, with voting Class A Common Stock and non-voting Class B Common

---

[16] First Am. Verified Class Action Compl. ("Compl.") (D.I. 41); *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004) (noting that on a motion to dismiss, the Court may consider documents that are "incorporated by reference" or "integral" to the complaint).

[17] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002).

[18] Compl. ¶ 17.

[19] *Id.*

[20] *Id.*

10

Stock.[21]  Both classes of stock were publicly traded on the New York Stock Exchange as "VIA" and "VIA.B," respectively.[22]

Non-party, CBS, was a publicly traded Delaware corporation headquartered in New York.[23]  CBS was a mass media conglomerate, with operations in cable, publishing, local television, film and streaming services.[24]  CBS also maintained a dual class stock structure, again with voting Class A Common Stock and non-voting Class B Common Stock.[25]  Both classes of stock were publicly traded on the New York Stock Exchange as "CBS.A" and "CBS," respectively.[26]

Lead Plaintiff, California Public Employees' Retirement System ("CalPERS"), has held shares of Class A and Class B Common Stock in Viacom at all relevant times.[27]  Additional Plaintiffs, Park Employees' and Retirement Board Employees' Annuity and Benefit Fund of Chicago and Louis M. Wilen (together

---

[21] *Id.*

[22] *Id.*

[23] Compl. ¶ 18.

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] Compl. ¶ 14.

with CalPERS, "Plaintiffs"), have held shares of Class B Common Stock in Viacom at all relevant times as well.[28]

Defendant, National Amusements, Inc. ("National Amusements"), is a privately held Maryland corporation headquartered in Norwood, Massachusetts, and Defendant, NAI Entertainment Holdings LLC (together with National Amusements, "NAI"), is a wholly owned subsidiary of National Amusements.[29] NAI is a national movie theater operator founded by Ms. Redstone's grandfather.[30] NAI was the controlling stockholder of both Viacom and CBS at all relevant times, holding approximately 80% of the Class A voting shares of each company.[31] Despite holding nearly 80% of the voting power in each company, NAI held only approximately 10.5% of the economic value of CBS and 9.9% of the economic value of Viacom at the time of the Merger.[32]

Defendant, Shari E. Redstone (together with NAI, the "NAI Parties"), is a director, president and controlling stockholder of NAI.[33] Ms. Redstone owns

---

[28] Compl. ¶¶ 15–16.

[29] Compl. ¶¶ 23, 24.

[30] Compl. ¶ 23.

[31] Compl. ¶ 24.

[32] *Id.*

[33] Compl. ¶ 20.

approximately 20% of NAI through the Shari E. Redstone Trust.[34] She served as a director of Viacom and as the Non-Executive Vice Chair of both the CBS and Viacom boards of directors at all relevant times.[35] Ms. Redstone is currently the Chair of the ViacomCBS board of directors (the "ViacomCBS Board").[36]

Non-party, Sumner Redstone, was the Emeritus Chairman of both CBS and Viacom.[37] He was Ms. Redstone's father.[38] At the time Plaintiffs' Complaint was filed, Sumner Redstone was the CEO, owner and Chairman of the Board of NAI, and he held approximately 80% of the voting control of NAI through the Sumner M. Redstone National Amusements Trust ("Trust").[39] Sumner Redstone has since passed, effectively leaving the control of the Trust and, by extension NAI, to Ms. Redstone.[40]

---

[34] *Id.*

[35] *Id.*

[36] *Id.*

[37] Compl. ¶ 21.

[38] Compl. ¶ 20.

[39] Compl. ¶ 22.

[40] *Id.*

Defendant, Thomas J. May, served on and chaired the Viacom board of directors (the "Viacom Board") from June 16, 2016 until the Merger closed.[41] May was co-chair of the Viacom special transaction committee (the "Viacom Committee") for each of the three attempted mergers with CBS (including the consummated Merger at issue here).[42] May has lived on the same street as Ms. Redstone since 1994, and May, Ms. Redstone and Sumner Redstone served together on two non-profit boards.[43]

Defendant, Judith A. McHale, served on the Viacom Board from June 16, 2016 until the Merger closed.[44] McHale was a member of the Viacom Committee for all three attempted mergers with CBS.[45] She was general counsel for MTV Networks in the mid-1980s when Viacom acquired the company.[46] McHale currently serves on the ViacomCBS Board.[47]

---

[41] Compl. ¶ 26.

[42] *Id.*

[43] *Id.*

[44] Compl. ¶ 27.

[45] *Id.*

[46] *Id.*

[47] *Id.*

Defendant, Ronald L. Nelson, served on the Viacom Board from June 16, 2016 until the Merger closed.[48] Nelson was a member of the Viacom Committee for all three Viacom/CBS merger attempts.[49] He was CFO and a director at Paramount when Viacom acquired the company, and he subsequently became COO at DreamWorks, which co-produced a variety of projects with Paramount.[50] Nelson currently serves on the ViacomCBS Board.[51]

Defendant, Nicole Seligman (together with May, McHale and Nelson, the "Viacom Committee Defendants"), served on the Viacom Board from June 16, 2016 until the Merger closed.[52] Seligman was co-chair of the Viacom Committee for all three Viacom/CBS merger attempts.[53] She was a former executive at Sony, of which NAI is a "long-term . . . customer," and she and Ms. Redstone served on a non-profit board together.[54] Seligman and Ms. Redstone regularly attend trade and social

---

[48] Compl. ¶ 28.

[49] *Id.*

[50] *Id.*

[51] *Id.*

[52] Compl. ¶ 29.

[53] *Id.*

[54] *Id.*

15

events together, and the closeness of their personal relationship has been the subject of several media reports.[55] Seligman currently serves on the ViacomCBS Board.[56]

Defendant, Robert M. Bakish, is a Viacom veteran, having served for years as President and CEO of International Media Networks and its predecessor, MTV Networks International, before serving as President, CEO and board member of Viacom from December 2016 until the Merger closed.[57] Bakish is currently the President and CEO of ViacomCBS.[58]

## B. Viacom's Pre-2016 History

At Sumner Redstone's behest, NAI first acquired a controlling interest in Viacom in 1987.[59] Throughout the years, Viacom made numerous acquisitions, including its acquisition of CBS in 2005.[60] On December 31, 2005, Sumner Redstone split Viacom and CBS, establishing the separate and operative legal entities that existed as of the Merger.[61] Sumner Redstone selected Les Moonves as

---

[55] *Id.*

[56] Compl. ¶ 29.

[57] Compl. ¶ 25.

[58] *Id.*

[59] Compl. ¶ 19.

[60] Compl. ¶¶ 19, 33.

[61] Compl. ¶¶ 17, 34.

16

CEO of CBS and Phillipe Dauman as CEO of Viacom.[62]  As noted, while NAI ensured its position as controlling stockholder in both entities by holding approximately 80% of the voting stock of each company,[63] it owned less than 11% of the equity in either entity as of the Merger.[64]

Recognizing this discrepancy between control and economic risk, Sumner Redstone took pains to ensure that responsible corporate governance was a cornerstone of both Viacom and CBS.[65]  One particularly salient measure related to succession; Mr. Redstone made clear his desire that the boards of Viacom and CBS select his successor because, in his view, his daughter, Shari Redstone, was not suitable for the job.[66]

As Sumner Redstone's health deteriorated in early 2016, he abdicated the roles of Chairman of Viacom and CBS.[67]  Viacom moved to appoint Phillipe

---

[62] Compl. ¶ 34.

[63] Compl. ¶¶ 19, 24.

[64] Compl. ¶¶ 24, 40.

[65] Compl. ¶¶ 35–36.

[66] Compl. ¶¶ 36–39, 42–45.

[67] Compl. ¶ 46.

Dauman, Sumner Redstone's designated CEO, to assume the role of Chairman of Viacom.[68] Ms. Redstone was the only Viacom Board member to oppose the move.[69]

Soon after Sumner Redstone's withdrawal from Viacom and CBS, Ms. Redstone began to whittle away at the governance protections her father had installed.[70] She removed Dauman from the NAI Board and as trustee of the Trust; she removed George Abrams, a longtime friend of both Sumner Redstone and Dauman, as trustee of the Trust; and she replaced both with trustees of her choosing.[71]

Sensing Ms. Redstone may next turn her focus to Viacom, the Viacom Board sent a letter to NAI on May 30, 2016, in which it emphasized that "attempts to remove Viacom directors from the board 'would be completely inconsistent with Sumner's lifetime commitment to an independent board and professional management for Viacom after his incapacity or death.'"[72] Now under Ms. Redstone's control, NAI responded two weeks later by issuing a written consent that purported to amend Viacom's bylaws to allow stockholders to fill vacancies on

---

[68] Compl. ¶¶ 47–48.

[69] Compl. ¶ 48.

[70] Compl. ¶¶ 49–56.

[71] Compl. ¶¶ 49, 50.

[72] Compl. ¶ 51.

the Viacom Board directly.[73]  NAI then promptly exercised this newly created authority by removing five of eleven directors on the Viacom Board.  Not coincidentally, the five removed directors included Dauman, Abrams and three others who had signed the May 30 letter on behalf of Viacom.[74]  NAI unilaterally replaced the removed directors with May, McHale, Nelson and Seligman.[75]  Apparently recognizing the unsettling circumstances surrounding their appointment, NAI agreed to indemnify each of the newly appointed directors for any liability arising from their appointments.[76]  This move proved prescient as litigation related to NAI's ouster of Viacom directors soon erupted on both coasts.[77]

## C. The First and Second Merger Attempts

Shortly after NAI's unilateral appointment of May, McHale, Nelson and Seligman to the Viacom Board, Ms. Redstone and NAI initiated their first attempt to cause a Viacom/CBS merger.[78]  In September 2016, NAI sent a letter to both

---

[73] Compl. ¶ 52.

[74] *Id.*

[75] Compl. ¶¶ 52–54.  The fifth replacement director, Kenneth Lerer, is not a party to this Action.

[76] Compl. ¶ 56.

[77] Compl. ¶¶ 57–58 (noting that the ousted directors sued in Massachusetts and Delaware, and NAI counter-sued in California).

[78] Compl. ¶ 59.

Viacom and CBS, requesting the two companies consider a combination.[79] In its letter, NAI proactively asserted it would not consider any combination or transaction that would require it to relinquish control of either company.[80] Viacom entertained Ms. Redstone's demand, establishing the first Viacom special transaction committee co-chaired by Seligman and May with McHale, Nelson and two other directors comprising the remainder of the committee.[81] This committee retained LionTree and Morgan Stanley as its financial advisors in November 2016.[82]

This first attempt at a Viacom/CBS merger never left the starting gate. The CBS board of directors ("CBS Board") refused to discuss a merger if NAI would not agree to relinquish its control. And NAI refused to agree to that condition.[83] Apparently recognizing that CBS had no desire to negotiate, NAI withdrew its request that the two companies explore a merger on December 12, 2016.[84] Ms. Redstone was not pleased. She advised the CBS Board that "the failure to get the deal done had caused Viacom to suffer" and declared her intent to continue to

---

[79] *Id.*

[80] *Id.*

[81] Compl. ¶ 61.

[82] Compl. ¶ 62. LionTree and Morgan Stanley remained the Viacom Committee's advisors throughout all three merger attempts. *Id.*

[83] Compl. ¶ 64.

[84] Compl. ¶¶ 63–64.

pursue the combination, stating "the merger would get done even if I have to use a different process."[85]

In the period between the first and second merger attempts, the Viacom Board selected Bakish as Viacom's President, CEO and newest board member.[86] Bakish was Ms. Redstone's choice and she expected him to keep her apprised of all major Viacom decisions.[87] With Ms. Redstone's support, Bakish was able to make significant changes at Viacom that substantially improved its financial performance.[88]

Ms. Redstone and NAI did not wait long to initiate the second attempt at a Viacom/CBS merger, advising both companies in January 2018 that NAI wanted their respective boards to re-engage in negotiations.[89] Both companies obliged, re-constituting their respective special committees within weeks of NAI's request.[90] For its part, the Viacom Committee's mandate was "to consider, with the support of [NAI], the possibility of a merger or other business combination between [Viacom]

---

[85] Compl. ¶ 63 (internal quotations omitted).

[86] Compl. ¶ 66.

[87] Compl. ¶ 67.

[88] Compl. ¶¶ 67–68.

[89] Compl. ¶ 69.

[90] Compl. ¶ 70.

and CBS" and "to propose, review and evaluate, recommend or reject any such potential transaction . . . in its sole discretion."[91] The Viacom Committee was again co-chaired by Seligman and May with McHale and Nelson comprising the balance of the committee.[92] While Seligman and May were co-chairs, Seligman spearheaded the negotiations and drove all substantive discussions.[93] This version of the Viacom Committee remained intact until the consummation of the Merger.[94]

NAI was omnipresent throughout the merger discussions. It was a named beneficiary of the Viacom Committee's confidentiality agreement and received all materials.[95] Through Ms. Redstone, NAI made clear that it would not agree to a majority of the minority condition, and the Viacom Committee, therefore, made no effort to negotiate for that protection on behalf of Viacom's public stockholders.[96] NAI also made clear that the merger consideration would be all stock, that it was unwilling to accept a third-party bid for Viacom and that it was unwilling to

---

[91] NAI Parties' Corrected Opening Br. in Supp. of the NAI Parties' Mot. to Dismiss Pls.' Verified Compl. ("NAI OB") (D.I. 84), Ex. 9 at 2.

[92] Compl. ¶ 71.

[93] Compl. ¶ 74.

[94] Compl. ¶ 71; NAI OB at 24.

[95] Compl. ¶ 72.

[96] Compl. ¶¶ 75–76.

relinquish its control position in either company or in the combined company.[97] The Viacom Committee capitulated and early in the process rebuffed interest from a third-party due to "the speculative nature of the overture and the risk of [distraction] from pursuing the substantial strategic benefits of a transaction between the Company and CBS that would be supported by NAI."[98]

NAI was also quick to express its expectations for governance of the combined company, stating that Bakish should "have a substantive position in the combined company."[99] Taking its cue, the Viacom Committee proposed that Moonves serve as Chairman and CEO and Bakish as President, COO and board member of the combined company.[100] CBS missed the cue and refused to consider Bakish for any senior management position.[101] The financial press was soon reporting that Ms. Redstone had threatened to replace recalcitrant CBS Board members.[102]

---

[97] Compl. ¶ 73.

[98] Compl. ¶ 77.

[99] Compl. ¶ 79.

[100] Compl. ¶ 80.

[101] Compl. ¶ 81.

[102] *Id.*

In the midst of the parties' rather stark differences on governance, the special committees initiated the negotiation of financial terms. At the outset, the offers and counters were far apart. To bridge the gap, Viacom provided CBS with its long-range projections for fiscal years 2018 through 2021 (the "2018 LRPs").[103] The 2018 LRPs were prepared by Viacom management in the ordinary course and management was confident they were "achievable."[104] The CBS special committee did not share that optimism and that informed its negotiations with respect to the exchange ratio.[105]

On "the assumption of no role for Robert Bakish in the management of the combined company," the special committees eventually settled upon an exchange ratio of 0.6135.[106] This implied a valuation of ~$12.8 billion for Viacom, well below the $13.7 billion valuation implied by the Viacom Committee's initial offer.[107] Recognizing Ms. Redstone's ultimate control over the process, the Viacom Committee, following Seligman's lead, unanimously agreed to advise CBS that it should address any concerns regarding "board composition matters" with NAI

---

[103] Compl. ¶ 86.

[104] Compl. ¶ 89.

[105] Compl. ¶ 90.

[106] Compl. ¶ 91.

[107] *Id.*

directly.[108]  Unwilling to bypass the Viacom Committee and negotiate directly with Ms. Redstone, the CBS special committee broke off negotiations and announced its view that the merger would not be in the best interest of CBS or its minority stockholders.[109]

Litigation ensued between CBS and NAI.  CBS feared retributive action by NAI—likely spurred by NAI's unilateral removal of Viacom directors with whom it disagreed in June of 2016.[110]  In a preemptive strike, CBS attempted to dilute NAI's voting control by issuing a special dividend of voting Class A shares to all stockholders.[111]  CBS then filed suit in this court seeking a temporary restraining order that would, among other things, prevent NAI from altering the composition of the CBS Board and prevent NAI from interfering with the special dividend.[112]  In its riposte, NAI executed written consents that essentially required its approval for any

---

[108] Compl. ¶¶ 92–93.

[109] Compl. ¶¶ 94–98.

[110] Compl. ¶¶ 99–100.

[111] Compl. ¶¶ 49–58, 99–106.

[112] Compl. ¶¶ 102–06.

amendments to CBS's bylaws.[113]  It then counter-sued for a declaration that CBS's effort to strip NAI of voting control was invalid.[114]

The parties ultimately settled the 2018 litigation when issues surfaced regarding Moonves' fitness to remain as CBS's CEO.[115]  After the dust settled, the special dividend was rescinded, NAI's consents were withdrawn, Moonves and several CBS directors had departed CBS and NAI gained greater control over the CBS Board.[116]  Importantly, as part of the settlement, Ms. Redstone agreed "not [to] propose a CBS-Viacom merger for two years."[117]

## D. The Third and Final Merger Attempt

With the Viacom and CBS boards now primed with NAI allies, NAI and Ms. Redstone's third and final attempt to prompt a Viacom/CBS merger came in early 2019.[118]  Notwithstanding her commitment in the 2018 settlement stipulation to take a rest from her campaign to cause a Viacom/CBS merger for two years, Ms. Redstone was already encouraging CBS interim CEO, Joseph Ianniello, to press

---

[113] Compl. ¶¶ 103–06.

[114] Compl. ¶ 105.

[115] Compl. ¶ 107.

[116] Compl. ¶¶ 107–12.

[117] Compl. ¶¶ 112.

[118] Compl. ¶¶ 113–14.

for a merger by late 2018 and again in early 2019.[119] The CBS Board began preliminary internal discussions about a possible merger in March 2019.[120] While the CBS Board initially thought it best to condition any merger on a majority of the minority vote, that plan was promptly scuttled when counsel for NAI made it clear that NAI would never agree to that condition.[121] With the knowledge that NAI "had already determined the negotiation framework," the CBS Board formed its special committee on April 7, 2019.[122]

Four days later, on April 11, Ianniello contacted Bakish to "restart" merger discussions between CBS and Viacom.[123] In response, Bakish advised Ianniello that Viacom's previously engaged financial advisors would "engage in further discussions to consider potential terms for a transaction and to conduct due diligence."[124] The Viacom Committee had never disbanded and was promptly

---

[119] Compl. ¶ 113.

[120] Compl. ¶ 115.

[121] Compl. ¶¶ 115–18.

[122] Compl. ¶¶ 117–18.

[123] Compl. ¶ 119.

[124] *Id.*

reignited to "pick[] up where they left off before the CBS rebellion and [the] Moonves [departure]."[125]

Viacom's position appeared strong entering into negotiations principally because its financial performance had significantly improved since the prior merger negotiations with CBS had broken off.[126] CBS's financial position, on the other hand, had declined.[127] Given the strength of Viacom's position, the Viacom Committee initially planned to focus negotiations on the exchange ratio before turning to governance issues for the combined company.[128] This plan was scuttled, however, when the Viacom Committee realized that NAI expected to nail down "governance and board items" in connection with the Merger as predicates to agreeing to a deal.[129]

CBS apparently understood the importance of governance issues to Viacom and, by extension, to NAI. Thus, when the Viacom Committee proffered the 2018 exchange ratio as a floor for the exchange ratio negotiations, CBS retorted that "the prior ratio was 'irrelevant to the current negotiations,' partially because of

---

[125] Compl. ¶ 120.

[126] Compl. ¶¶ 126–39.

[127] Compl. ¶¶ 140–47, 152–66.

[128] Compl. ¶ 167.

[129] *Id.*

'differences in the proposed governance terms of the currently proposed transaction as compared with the proposed governance terms' in the 2018 transaction."[130] The principal "difference" referenced by CBS was NAI and Ms. Redstone's insistence that Bakish, Ms. Redstone's "loyal Viacom CEO," serve not only on the board but also as CEO of the combined company.[131]

Bakish met with the CBS special committee in July 2019 to discuss its concerns with NAI's (and Viacom's) governance demands.[132] Sensing how important these demands were to NAI, the CBS special committee informed Bakish that the parties would have to agree on governance and management matters before turning to the negotiation of the exchange ratio.[133] Bakish relayed these discussions to the Viacom Committee, reiterating the unavoidable divergence of fulfilling NAI's governance demands and maximizing Viacom stockholder value—a trade-off that ultimately favored NAI and Ms. Redstone.[134]

On August 12, 2019, the parties settled upon a governance structure to NAI and Ms. Redstone's liking: a combined board of six former CBS directors, four

---

[130] Compl. ¶ 181.

[131] Compl. ¶¶ 4, 182–85.

[132] Compl. ¶ 184.

[133] *Id.*

[134] Compl. ¶¶ 185, 195–96.

former Viacom directors and three NAI designees, with Ms. Redstone as Chair and Bakish as board member and CEO.[135]  In exchange for this governance structure, the parties agreed to an exchange ratio of 0.59625, valuing Viacom at $11.9 billion. This was ~$1 billion less than the Viacom stockholders would have received had the merger been consummated at the 2018 exchange ratio.[136]  The Merger closed on December 4, 2019.

## E. Procedural History

On November 25, 2019, the first of several lawsuits challenging the Merger was filed on behalf of Viacom stockholders in this Court.[137]  On January 23, 2020, the Court consolidated the actions and, on February 6, 2020, selected lead plaintiffs and lead counsel.[138]  Plaintiffs then filed their operative Complaint on February 28, 2020.[139]

The Complaint asserts three direct claims.  Count I asserts a claim for breach of fiduciary duty against the NAI Parties as controlling stockholder of Viacom for

---

[135] Compl. ¶¶ 195–96.

[136] Compl. ¶¶ 193, 214.

[137] *See, e.g.*, Verified Class Action Compl. (D.I. 1).

[138] D.I. 18, 40.

[139] D.I. 41.

causing Viacom to consummate a demonstrably conflicted and unfair Merger.[140]

Count II asserts claims against the Viacom Committee Defendants for breach of fiduciary duty "by preferring Ms. Redstone's dream to combine Viacom and CBS and governance demands over the rights of nonaffiliated stockholders and subsequently approving an exchange ratio that deprived Viacom stockholders of fair value."[141] Count III asserts a claim for breach of fiduciary duty against Bakish, in his capacity as officer, for "pursuing self-enrichment as the chief executive of ViacomCBS over the interests of Viacom stockholders."[142]

Each of the Defendants have separately moved to dismiss the Complaint.[143] This decision resolves all pending motions.

## II. ANALYSIS

The standard for deciding a motion to dismiss under Court of Chancery Rule 12(b)(6) is well-settled:

> all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the

---

[140] Compl. ¶¶ 230–35.

[141] Compl. ¶¶ 236–39.

[142] Compl. ¶¶ 240–44.

[143] Defs. May, McHale, Nelson and Seligman's Mot. to Dismiss (D.I. 45); NAI Defs.' Mot. to Dismiss (D.I. 46); Def. Bakish's Mot. to Dismiss (D.I. 47).

plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[144]

Defendants' motions to dismiss present the gating question that frequently dictates the pleadings stage disposition of breach of fiduciary duty claims: under what standard of review will the court adjudicate the claim? As this court has observed:

> If the court reviews the fiduciary conduct under the deferential business judgment rule, the claim is unlikely to proceed beyond the proverbial starting line. If, on the other hand, the court reviews the conduct under the entire fairness standard, the claim is likely to proceed at least through discovery, if not trial. Given the high stakes and costs of corporate fiduciary duty litigation, defendants understandably are prone to call the "standard of review" question at the earliest opportunity, usually at the pleadings stage.[145]

Appreciating the pleading stage implications of the standard of review designation, Plaintiffs proffer entire fairness as the applicable standard,[146] while Defendants maintain that business judgment rule deference is mandated by Plaintiffs' pled facts. As explained below, I am satisfied Plaintiffs have well-pled that a conflicted controlling stockholder stood on both sides of the Merger. Having done so, Plaintiffs have implicated entire fairness review, at least at this stage of the

---

[144] *Savor, Inc.*, 812 A.2d at 896–97 (citation omitted).

[145] *Tornetta*, 2019 WL 4566943, at *1.

[146] *See Orman*, 794 A.2d at 20 n.36 (application of entire fairness "normally will preclude dismissal of a complaint on a Rule 12(b)(6) motion to dismiss").

proceedings, with respect to their claims against the NAI Parties. They have also pled facts that allow a reasonable inference that the Viacom Committee Defendants acted in deference, and out of loyalty, to Ms. Redstone in a manner detrimental to Viacom's minority stockholders. Thus, Plaintiffs have pled viable claims against the NAI Parties and viable, non-exculpated claims against the Viacom Committee Defendants that are not susceptible to dismissal on a Rule 12(b)(6) motion. As for the claims against Bakish, however, there are no well-pled allegations that Bakish did anything wrong with respect to the Merger regardless of the applicable standard of review. The claim against him, therefore, must be dismissed.

### A. The Complaint Well-Pleads Breach of Fiduciary Duty Claims Against the NAI Parties (Count I)

Because a controlling stockholder "occupies a uniquely advantageous position for extracting differential benefits from the corporation at the expense of minority stockholders," our law has long recognized that it is right to impose upon the controller the fiduciary duty of loyalty and good faith running to the corporation and its other stockholders.[147] That fiduciary duty, reflecting the standard of conduct

---

[147] *In re EZcorp Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at \*11 (Del. Ch. Jan. 25, 2016) (citing *The Delaware Way*, at 678).

expected of the controller, is to be distinguished from the standard of review by which the court tests whether the fiduciary has met the standard of conduct.[148]

While the controller always owes fiduciary duties, the standard of review by which to test whether the controller has fulfilled those duties is not constant. The presence of a controller in the midst of a corporate transaction, without more, does "not automatically subject [the controller's conduct] to entire fairness review. . . ."[149] Rather, the court cannot determine the standard of review until it assesses whether the controller engaged in a "conflicted transaction."[150]

As a general matter, under our law, a controller engages in a "conflicted transaction" when (1) "the controller stands on both sides"; or (2) "the controller competes with the common stockholders for consideration."[151] The controller will be deemed to "compete with common stockholders for consideration" when the controller (1) "receives greater monetary consideration for its shares than the

---

[148] *Glidepath Ltd. v. Beumer Corp.*, 2019 WL 855660, at *18 (Del. Ch. Feb. 21, 2019).

[149] *IRA Tr. FBO Bobbie Ahmed v. Crane*, 2017 WL 7053964, at *6 (Del. Ch. Dec. 11, 2017, revised Jan. 26, 2018); *see also In re Crimson Expl. Inc. S'holder Litig.,* 2014 WL 5449419, at *12 (Del. Ch. Oct. 24, 2014) ("Entire fairness is not triggered solely because a company has a controlling stockholder.").

[150] *Crimson*, 2014 WL 5449419, at *12.

[151] *Id.*; *see also Larkin v. Shah*, 2016 WL 4485447, at *8 (Del. Ch. Aug. 25, 2016) ("Conflicted transactions include those in which the controller stands on both sides of the deal (for example, when a parent acquires its subsidiary), as well as those in which the controller stands on only one side of the deal but 'competes with the common stockholders for consideration.'").

minority stockholders"; (2) "takes a different form of consideration than the minority stockholders"; or (3) "gets a unique benefit by extracting something uniquely valuable to the controller, even if the controller nominally receives the same consideration as all other stockholders."[152] Under any of these scenarios, the controller's conduct will be tested for entire fairness, "the highest standard of review in corporate law."[153] In the merger context, where the controller engages in a conflicted transaction, entire fairness applies "as a substitute for the dual statutory protections of disinterested board and stockholder approval, because both protections are potentially undermined by the influence of the controller."[154]

The parties here agree on three basic facts that drive the ensuing discussion. First, NAI was the controlling stockholder of both Viacom and CBS, holding slightly more than 80% of the voting power in each entity.[155] Second, in the Merger, NAI "stood on both sides."[156] And third, the Viacom Committee did not negotiate for the

---

[152] *IRA Tr.*, 2017 WL 7053964, at *6 (internal quotations omitted).

[153] *Crimson*, 2014 WL 5449419, at *9.

[154] *Id.*

[155] *See* Compl. ¶ 24; *see also In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980, 991 (Del. Ch. 2014) (describing "two scenarios in which a stockholder could be found a controller under Delaware law: where the stockholder (1) owns more than 50% of the voting power of a corporation or (2) owns less than 50% of the voting power of the corporation but '*exercises control* over the business affairs of the corporation'") (emphasis in original).

[156] Compl. ¶ 24; *Larkin*, 2016 WL 4485447, at *8.

so-called *MFW* "dual protections" that, if properly executed, would have triggered business judgment rule review of breach of fiduciary duty claims arising from the Merger.[157]  From here, the parties part ways.

Plaintiffs maintain that, following the seminal *Weinberger v. UOP*, *Inc.*, it has long been settled in Delaware that, "where one stands on both sides of a transaction, he has the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts."[158]  According to Plaintiffs, since NAI indisputably stood on both sides of the Merger, entire fairness is the applicable standard of review. Hard stop.

With equal fervency, Defendants counter that our law is settled that "mere presence" of the controller on both sides of a transaction is not enough to trigger entire fairness review.  Citing the seminal *Sinclair Oil Corp. v. Levien*,[159] Defendants maintain that "[t]he basic situation for the application of the [entire fairness] rule is the one in which the [controller] has received a benefit to the exclusion and at the expense of the [minority]."[160]  According to Defendants, since Plaintiffs have failed to do more than allege the mere presence of the NAI Parties on both sides of the

---

[157] *MFW*, 88 A.3d at 644.

[158] 457 A.2d at 710.

[159] 280 A.2d 717 (Del. 1971).

[160] *Id.* at 720.

Merger, and, in particular have failed to allege that the NAI Parties received any benefit "to the exclusion and at the expense" of the Viacom minority stockholders, entire fairness review has no place here.

That highly experienced and highly competent corporate litigators have such a fundamentally disparate view of supposedly "settled" Delaware corporate law is either surprising, or not at all surprising, depending upon one's perspective on the role of zealous advocates.[161]  Surprising or not, the disconnect is, if nothing else, provocative and worthy of further exploration.  Ultimately, as explained below, because I find Plaintiffs have well pled the Merger was a "conflicted transaction" beyond NAI's presence on both sides, I acknowledge that the following discussion of the "mere presence" debate, unabashedly, straddles the line between *obiter dicta*

---

[161] Speaking of zealous advocacy, in an interesting twist, NAI acknowledged in the 2018 CBS litigation that its decision not to commit up front to a majority-of-the-minority vote condition in connection with the proposed 2018 Viacom/CBS merger was not indicative of wrongdoing but simply meant that "any transaction would *therefore* be subject to 'entire fairness' review."  Compl. ¶ 5 (quoting paragraph 5 of NAI's complaint in *In re CBS Corp. Litig.*, C.A. No. 2018-0342-AGB) (emphasis added).  Because it is not necessary, I decline Plaintiffs' request that I engage in a judicial estoppel analysis based on this "admission" by NAI in prior litigation.

and judicial *dicta*.[162] As the dispute may become relevant later in this litigation, however, it is appropriate to frame the debate and share some observations.[163]

### 1. The "Mere Presence" Debate

Plaintiffs quote *Weinberger* correctly; our Supreme Court there clearly stated, "where one stands on both sides of a transaction, he has the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts."[164] Two years later, in *Rosenblatt v. Getty Oil*, when determining the standard of review by which to test a controller's compliance with fiduciary duties, the court observed: "Clearly, Getty, as majority shareholder of Skelly, stood on both sides of this transaction and bore the initial burden of establishing its entire fairness."[165] The court did not ask whether the controller who "stood on both sides" engaged in self-dealing or received a non-ratable benefit from the transaction; instead, the court

---

[162] *See Wild Meadows MHC, LLC v. Weidman*, 2020 WL 3889057, at \*7 (Del. Super. Ct. July 10, 2020) (offering a useful distinction between *obiter dicta*, or "by the way" comments of the court when rendering a decision, and "judicial *dictum*," or "expressions of opinion [by the court] upon a point in a case argued by counsel and deliberately passed upon . . . though not essential to the disposition of the cause").

[163] I say the debate may become relevant down the road because if Plaintiffs are unable to secure evidence in support of their allegations that the NAI Parties secured non-ratable benefits from the Merger not shared by Viacom stockholders, Plaintiffs likely, and understandably, will revert to their "mere presence" argument in urging the Court to continue to review the NAI Parties' fiduciary conduct for entire fairness.

[164] 457 A.2d at 710.

[165] *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 937 (Del. 1985).

noted the controller's presence "on both sides" and then declared that entire fairness was the standard of review.[166]

In his important and oft-cited decision in *Citron v. E.I. DuPont de Nemours & Co.*, then-Vice Chancellor Jacobs provided a clear explanation of why a controlling stockholder standing on both sides of the transaction should trigger "the more stringent entire fairness standard of judicial review."[167] There, DuPont owned 69.54% of Remington's stock and sought to squeeze-out the minority by merger. In this context, the court noted, "[i]t is undisputed that DuPont, as the majority stockholder standing on both sides of the transaction, would normally have the burden to prove that the merger was entirely fair."[168] In setting entire fairness as the standard of review, the court observed that, in transactions where the controller stands on both sides, the transaction is "proposed by a party that controls, and will continue to control, the corporation," and in such instances, the "controlling stockholder relationship has the inherent potential to influence, however subtly, the

---

[166] The principle was reaffirmed two years later in *Bershad v. Curtiss-Wright Corp.*, 535 A.2d 840, 845 (Del. 1987), where the court held: "When a majority shareholder stands on both sides of a transaction, the requirement of fairness is 'unflinching' in its demand that the controlling stockholder establish the entire fairness of the undertaking sufficient to pass the test of careful scrutiny by the courts."

[167] 584 A.2d 490, 502 (Del. Ch. 1990).

[168] *Id.*

vote of minority stockholders in a manner that is not likely to occur in a transaction with a noncontrolling party."[169]

Then-Vice Chancellor Strine described the risk of coercion when the controller stands on both sides more colorfully in *In re Pure Resources*:

> In colloquial terms, the Supreme Court [in *Kahn v. Lynch Communication Systems, Inc.*] saw the controlling stockholder as the 800–pound gorilla whose urgent hunger for the rest of the bananas is likely to frighten less powerful primates like putatively independent directors who might well have been hand-picked by the gorilla (and who at the very least owed their seats on the board to his support).[170]

---

[169] *Id.* (further explaining that "[e]ven where no coercion is intended," the presence of the controller on both sides may unduly influence the progression of the transaction in a manner that differs from what would result from arms-length bargaining); *see also id.* (noting that "no court could be certain whether the transaction terms fully approximate what truly independent parties would have achieved in an arm's length negotiation"); *Kahn v. Tremont Corp.*, 694 A.2d 422, 428–29 (Del. 1997) ("*Tremont II*") ("The risk is thus created that those who pass upon the propriety of the transaction might perceive that disapproval may result in retaliation by the controlling shareholder."); *Larkin*, 2016 WL 4485447, at *9 ("[C]ases where the controller stands on both sides of the transaction present a particularly compelling reason to apply entire fairness: both corporate decision-making bodies to which Delaware courts ardently defer—the board of directors and disinterested voting stockholders—are considered compromised by the controller's influence.").

[170] *In re Pure Res., Inc., S'holders Litig.,* 808 A.2d 421, 436 (Del. Ch. 2002) (citing *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110 (Del. 1994)); *see also In re Tesla Motors, Inc.*, 2020 WL 553902, at *6 (Del. Ch. Feb. 4, 2020) ("And, as an '800-pound gorilla' in the board room and at the ballot box, the controller has retributive capacities that lead our courts to question whether independent directors or voting shareholders can freely exercise their judgment in approving transactions sponsored by the controller."); *id.* at *7 (noting that applying entire fairness review to transactions where controllers stand on both sides "is simply a recognition that because conflicted controller transactions have such strong potential for self-dealing, absent replication of an arm's-length transaction process, an independent judge should thoroughly examine the transaction's substantive fairness").

One can draw from this observation an appreciation that the dynamic created by the "mere presence" of the controller on both sides of a transaction is one of inherent coercion that even putatively independent directors will struggle to resist.[171]

The "mere presence" rule Plaintiffs endorse appears to have been stated most directly by our Supreme Court in *Emerald Partners v. Berlin* where, in setting the standard of review, the court held, "[the controller's] stance on both sides as a corporate fiduciary, ***alone***, is sufficient to require the demonstration of entire fairness."[172] Here again, in stating this rule, the court said nothing of the controller competing with the minority for consideration or otherwise deriving non-ratable benefits from the challenged transaction.

For their part, Defendants, and in particular the NAI Parties, accurately quote *Sinclair*, where, to reiterate, the court held, "[t]he basic situation for the application of the [entire fairness] rule is the one in which the [controller] has received a benefit

---

[171] *See In re USG Corp. S'holder Litig.*, 2020 WL 5126671, at \*13 (Del. Ch. Aug. 31, 2020) (citations omitted) (observing, "the mere presence of a controller [on one side of a transaction] does not trigger entire fairness *per se*. Rather, coercion is assumed, and entire fairness invoked, when the controller engages in a conflicted transaction, which occurs when a controller sits on both sides of the transaction, or is on only one side but 'competes with the common stockholders for consideration.'").

[172] 726 A.2d 1215, 1221 n.8 (Del. 1999) (emphasis added). *Accord Orman*, 794 A.2d at 21 n.36 (clarifying that *Emerald Partners* "reiterated that entire fairness review applies when a controlling shareholder stands on both sides of a challenged transaction").

41

to the exclusion and at the expense of the [minority]."[173]  In keeping with this "basic"

pronouncement, the NAI Parties maintain that in each instance where a Delaware

court has observed that a controller's presence on both sides of a transaction will

trigger entire fairness review, there is always something more that causes the court

to conclude that the controller is conflicted.

For example, in *In re Southern Peru*, the court appeared to cabin the entire

fairness implications of the controller "standing on both sides of the transaction" to

instances where the controller operates under some other "conflicting self-

interest."[174]  In *In re CNX Gas Corporation Shareholders Litigation*, the court noted

that entire fairness "will be applied only when the fiduciary duty is accompanied by

self-dealing—the situation when a parent is on both sides of a transaction *with its*

*subsidiary*."[175]  Indeed, the NAI Parties note that each "controller on both sides"

case cited by Plaintiffs involves either some variant of a parent-subsidiary

transaction where, by definition, the parent is interested in receiving the best

---

[173] *Sinclair*, 280 A.2d at 720.

[174] *In re Southern Peru Copper Corp. S'holder Deriv. Litig.*, 52 A.3d 761, 787 (Del. Ch. 2011), *aff'd sub nom. Ams. Mining Corp. v. Theriault*, 51 A.3d 1213 (Del. 2012).

[175] 4 A.3d 397, 411 (Del. Ch. 2010) (emphasis added) (citing *Sinclair*, 280 A.2d at 720).

financial deal for itself regardless of the will of the minority,[176] or some other flavor

of controller self-interest.[177] It is not surprising, say the NAI Parties, that Plaintiffs

can point to no Delaware case where the court reviewed the controller's conduct for

entire fairness where *all* the plaintiff had alleged was that the controller stood on

both sides of a transaction.

The NAI Parties are right to seize upon nuance. The rules stated in the judicial

decisions that comprise our common law are driven by the facts of the cases in which

the rules are stated. As Chancellor Chandler has explained, "the opinions of the

Court of Chancery [are] akin to parables; that is, they read like morality stories

describing the behavior of directors and managers, both the good behavior and the

bad."[178] These "parables" tell stories, for sure, but they also draw "road maps" with

rule statements, prompted by the stories, that serve both to adjudicate the discreet

dispute and provide future guidance for other fiduciaries regarding "what is expected

---

[176] The NAI Parties point out that even *Weinberger*, Plaintiffs' favorite case, involved a parent company cash-out of a subsidiary's minority stockholders on unfair terms. *Weinberger*, 457 A.2d at 703.

[177] *In re Tesla Motors, Inc. S'holder Litig.*, 2018 WL 1560293, at *2 (Del. Ch. Mar. 18, 2018) ("*Tesla I*") (involving a controller allegedly causing one controlled company to "bailout" another controlled company that was failing by acquiring the failing company at an unfair price); *In re BGC P'rs, Inc.*, 2019 WL 4745121 (Del. Ch. Sept. 30, 2019) (same); *Southern Peru*, 52 A.3d at 787 (same).

[178] William B. Chandler III, *Our National Challenge: A Blueprint for Restoring the Public Trust*, 6 U. St. Thomas L.J. 421, 423 (Winter 2009).

of them" under our law.[179]   The rule statements, of course, must be considered against the nuance of the facts that prompted them.

On the other hand, Delaware courts can be trusted to say what they mean and mean what they say.  This is true in all areas, but perhaps more so when our courts are adding to the canon of our corporate law, a law that prospectively guides the conduct of countless corporate fiduciaries and is "often follow[ed]" by other jurisdictions.[180]  With this in mind, it is difficult to escape the clarity with which the Supreme Court stated the "presence on both sides" rule in *Emerald Partners*: "[the controller's] stance on both sides as a corporate fiduciary, ***alone***, is sufficient to require the demonstration of entire fairness."[181]  While *Emerald Partners*, itself, may be laced with factual nuance, the rule, as stated there, leaves little, if any, room for nuance.[182]  And that rule appears to comport with the "mere presence" argument Plaintiffs advance here.[183]

---

[179] *Id.*

[180] Jens Dammann & Henry Hansmann, *Globalizing Commercial Litigation*, 94 Cornell L. Rev. 1, 17 (Nov. 2008).

[181] *Emerald P'rs*, 726 A.2d at 1221 n.8 (emphasis added).

[182] For instance, I acknowledge that the controller in *Emerald Partners* was alleged to have pursued mergers of controlled companies as a means to rescue several real estate firms owned by the controller and his family.  *Id.* at 1218.

[183] I note that Viacom and CBS's dual-class structures, whereby NAI possessed more than 80% of the voting power but faced only 10% of the economic risk in both companies, commends Plaintiffs' "mere presence" argument for careful consideration in this case. *See* David T. White, *Delaware's Role in Handling the Rise of Dual-, Multi-, and Zero-*

As I admitted at the outset of this discussion, the parties' "mere presence" debate is interesting and may well prove relevant down the road, but for now, I need not declare a winner. As explained below, Plaintiffs have pled more than NAI's mere presence on both sides of the Merger. They have also well-pled that Ms. Redstone received a non-ratable benefit from the Merger at the expense of Viacom's minority stockholders.

## 2. The Non-Ratable Benefit

There can be no credible debate that entire fairness review is triggered when the controlling stockholder "compete[s] with other stockholders for consideration or otherwise receive[s] a non-ratable benefit at the expense of minority shareholders."[184] A non-ratable benefit exists when the controller receives a "unique

---

*Class Voting Structures*, 45 Del. J. Corp. L. 141, 153–54 (2020) (positing that in dual-class structures, "the owners of the majority voting rights in these companies are less concerned when riskier moves fail as compared to their counterparts at 'one share-one vote' corporations"); Lucian A. Bebchuk & Kobi Kastiel, *The Perils of Small-Minority Controllers*, 107 Geo. L.J. 1453, 1466 (2019) (observing that "small-minority controllers are insulated from market disciplinary forces [in dual-class companies] and thus lack incentives generated by the threat of replacement, which would mitigate the risk that they will act in ways that are contrary to the interests of other public investors"); *id.* ("[D]ual-class structures with small-minority controllers generate significant governance risks because they feature a unique absence of incentive alignment.").

[184] NAI OB at 32 (citing *Crimson*, 2014 WL 5449419, at *12); *see also In re Primedia, Inc. S'holders Litig.*, 67 A.3d 455, 486 (Del. Ch. 2013) ("When a corporation with a controlling stockholder is sold to a third party, the entire fairness standard applies if the controlling stockholder receives a benefit not shared with the minority."); *EZcorp*, 2016 WL 301245, at *11 ("A controlling stockholder occupies a uniquely advantageous position for

benefit by extracting something uniquely valuable to the controller, even if the controller nominally receives the same consideration as all other stockholders."[185] While the parties appear to agree that this court has had no cause to apply the non-ratable framework in the merger context where the controller stands on both sides of the transaction but receives the same consideration as all other stockholders, I can discern no reason why the controller should not be obliged to prove that the merger was entirely fair when the controller ostensibly receives the same merger consideration as other stockholders but also receives a non-ratable benefit to the detriment of the minority.

According to the NAI Parties, there are only two scenarios where a controller can be deemed to have achieved a non-ratable benefit from a transaction when all stockholders, controlling and minority alike, receive the same consideration: "(a) the controller eliminates something bad for it and good for the minority, as in the elimination of the derivative claims in *Primedia*; or (b) all parties suffer a sub-optimal price, but the controller still benefits because it receives cash to satisfy an

---

extracting differential benefits from the corporation at the expense of minority stockholders.").

[185] *IRA Tr.*, 2017 WL 7053964, at *7 (internal quotations omitted); *Crimson*, 2014 WL 5449419, at *12–14.

idiosyncratic liquidity problem, as in *infoGROUP*."[186] To be sure, both scenarios implicate the non-ratable benefit problem for the controller even when she receives the same financial consideration from the transaction received by the minority. In this regard, *Primedia* and *infoGROUP* reflect that, as Chancellor Allen so aptly stated, financial "[g]reed is not the only human emotion that can pull one from the path of propriety; so might hatred, lust, envy, revenge, . . . shame or pride. Indeed any human emotion may cause a [fiduciary] to place [her] own interests, preferences or appetites before the welfare of the corporation."[187] That same sensibility was on full display in *IRA Trust FBO Bobbie Ahmed v. Crane,* a case that offers useful guidance here and illustrates a third instance where non-ratable benefits from a transaction flowing to the controller can justify entire fairness review even when the controller ostensibly receives the same consideration as the minority.[188]

In *Crane*, a controlling stockholder with 55% voting power feared dilution of its voting control in future transactions.[189] To address this concern, the controller sought to implement a recapitalization whereby all stockholders holding voting

---

[186] NAI OB at 43 (citing *Crimson*, 2014 WL 5449419, at *20, which in turn cites, *Primedia*, 67 A.3d 455 and *N.J. Carpenters Pension Fund v. infoGROUP, Inc.*, 2011 WL 4825888 (Del. Ch. Oct. 6, 2011)).

[187] *In re RJR Nabisco, Inc. S'holder Litig.*, 1989 WL 7036, at *15 (Del. Ch. Jan. 31, 1989).

[188] 2017 WL 7053964 (Del. Ch. Dec. 11, 2017, revised Jan. 26, 2018).

[189] *Id.* at *3–4.

stock, including the controller, would receive a single non-voting share for each of their voting shares.[190] Minority stockholders understandably were displeased with the resulting recapitalization and challenged the transaction. In reviewing the viability of Plaintiff's breach of fiduciary duty claim on a motion to dismiss, the court found the existence of a non-ratable benefit that justified entire fairness review because the controller initiated the transaction to perpetuate its control of the company.[191] Specifically, the non-ratable benefit was the controller's ability "to ensure it would be able to retain voting control of [the company] well into the future without abandoning a key aspect of its original business model . . . ."[192] The benefit was not purely economic; it was the perpetuation of control for control's sake.[193]

The Plaintiffs' well-pled allegations create a reasonable inference that Ms. Redstone, through NAI, used the Merger as a means to consolidate her control of Viacom and CBS at the expense of the Viacom minority stockholders. According

---

[190] *Id.* at *4.

[191] *Id.* at *9.

[192] *Id.*

[193] *Id.* at *8 (rejecting defendant's reliance on *Sinclair* for the proposition that entire fairness will not apply to a pro rata dividend paid to all stockholders, instead finding "NRG did receive something from Yield to the exclusion of the minority stockholders—the means to perpetuate its control position by financing future acquisitions with the low-vote Class C stock authorized in the Reclassification").

to the Complaint, Ms. Redstone had long desired to combine the media companies her father had built in order to consolidate her control of both companies and solidify her status as a media mogul.[194] Her desire was fueled in 2016 amid concern that CBS might agree to be acquired by a large technology company.[195] She tried to push through a Viacom/CBS merger then but failed.[196] She tried again in 2018 but was rebuffed by the CBS Board in spectacular fashion, culminating in that board's desperate attempt to dilute NAI's voting control over CBS and its initiation of litigation to prevent the merger.[197]  Two years earlier, in 2016, when the

---

[194] Compl. ¶¶ 2–13, 63–64, 69, 98, 197; NAI OB at 49 ("Ms. Redstone achieved her desperately desired Merger, designed to build an empire and secure her legacy.").

[195] Compl. ¶ 60.

[196] Compl. ¶¶ 3–4, 59–64.

[197] Compl. ¶¶ 100–107.  In its opening brief, NAI argues that Plaintiffs may not assert facts relating to prior transactions in support of their claims here because Viacom released NAI from "any and all Claims" arising out of the failed 2016 merger in a settlement agreement the parties reached in related litigation.  NAI OB at 53.  I do not follow this argument. Plaintiffs are not bringing claims relating to the transactions that are the subject of the release.  They are stating facts relating to those transactions to support new claims regarding a new transaction.  Releases release claims, not facts relating to claims.  NAI also argues that because Plaintiffs' allegations here have been lifted wholesale from an old complaint, the Court should disregard the allegations as immaterial.  NAI OB at 55.  But, the allegations regarding the NAI Parties' past conduct are relevant in that, according to Plaintiffs, they set the stage for NAI's actions with respect to the Merger. *See Bear Stearns Mortg. Funding Tr. 2007-AR2 v. EMC Mortg. LLC,* 2013 WL 164098, at *1 (Del. Ch. Jan. 15, 2013) (denying a motion to strike allegations from a complaint that had been lifted from a prior complaint addressing events that pre-dated the events giving rise to the complaint at issue, noting the allegations of past events served as proper background for the dispute *sub judice*).

Viacom/CBS merger failed, Ms. Redstone made her displeasure clear to the CBS Board, vowing that "the merger would get done even if I have to use a different process."[198]  She was true to her word in 2019.

After reshaping the boards of both companies, and in defiance of a stipulation not to instigate merger negotiations between them for at least two years, Ms. Redstone returned in 2019, whispering in the ears of her compatriots that a merger was still a good idea and that they should pursue it.[199]  In a gesture that exposed her true motives, Ms. Redstone insisted that Bakish, then the CEO of Viacom and her loyal confederate,[200] become the CEO of the combined entity, knowing well, given past events, that the CBS special committee would resist and seek valuable consideration in return for its capitulation.[201]  And that is exactly what

---

[198] Compl. ¶ 63 (internal quotations omitted).

[199] Compl. ¶¶ 113–14.

[200] Compl. ¶ 182.  The NAI Parties argue the Complaint fails to well plead Bakish's allegiance to Ms. Redstone.  I disagree.  The Complaint alleges that, notwithstanding that Ms. Redstone had committed to withdraw from any discussions regarding a Viacom/CBS merger for two years in the 2018 settlement, Bakish regularly kept her informed of the status of negotiations throughout 2019.  Compl. ¶ 67.  More to the point, whether Bakish was, in fact, implacably loyal to Ms. Redstone, the Complaint well pleads that Ms. Redstone believed that he was, and acted accordingly.  Compl. ¶ 182.

[201] Compl. ¶¶ 181–83.  On this point, the NAI Parties argue it cannot be disputed that Bakish performed well as Viacom's CEO and it is, therefore, not at all surprising or problematic that the NAI Parties would push for Bakish to become the CEO of the combined company.  To be sure, Plaintiffs have acknowledged that, under Bakish's leadership, Viacom performed very well in the months leading up to the Merger.  Compl. ¶¶ 65–68.  Even so, the NAI Parties miss the point of Plaintiffs' breach of fiduciary claim against them.  Plaintiffs allege that by installing a CEO in a combined Viacom/CBS

happened; the CBS special committee made clear that the exchange ratio agreed to in 2018 was off the table given the "differences in the proposed governance terms of the currently proposed transaction as compared with the [previously] proposed governance terms."[202] Those governance terms, as pled, largely involved NAI's insistence that Bakish be named CEO of the combined company. The CBS special committee viewed this governance term as a "significant concession," and both deal parties came to appreciate that the concession would cost Viacom in the exchange ratio.[203] Exploiting this leverage, the CBS special committee informed Bakish that the negotiation of governance issues would come first before CBS would discuss the exchange ratio.[204]

This insistence on Bakish as CEO was Ms. Redstone's first step in cementing a loyal management team in the combined company that would yield to her demands. But the consolidation of her control went further. As bargained for, the board of the combined company would consist of six former CBS directors, four former Viacom

---

to whom she had unfiltered access, and over whom she exercised unfettered control, Ms. Redstone and the NAI Parties obtained a benefit from the Merger not enjoyed before the Merger and not shared by the other Viacom stockholders—a non-ratable benefit that, according to Plaintiffs, cost Viacom stockholders ~$1 billion.

[202] Compl. ¶ 181.

[203] Compl. ¶ 183.

[204] Compl. ¶ 184.

51

directors and three NAI designees.[205]  Ultimately, following the horse-trading on governance to meet NAI's demands, the two special committees settled on a valuation for Viacom of $11.9 billion, roughly $1 billion less than the same committees had agreed to in connection with the scuttled 2018 transaction.[206]

NAI's fixation on consolidated control, where Ms. Redstone maintains both the management and board she wants within the combined entity, is precisely the strain of controller benefit characterized as non-ratable in *Crane*.  Ms. Redstone was concerned about her ability to control both companies, at least practically, if they stayed as separate entities.  Similarly, in *Crane*, the controller used the challenged recapitalization to "perpetuate its control position" to avoid loss of control at a future date.[207]  The past actions of the CBS Board make it reasonably conceivable that Ms. Redstone was concerned about loss of control; and consolidating the companies and installing loyal management and directors would ensure her control position would expand and continue.[208]  Therefore, the Complaint's well-pled allegations

---

[205] Compl. ¶ 195.

[206] Compl. ¶¶ 9, 216.

[207] *IRA Tr.*, 2017 WL 7053964, at *8.

[208] Importantly, this is not the same thing as "merely preserving the controlling stockholder's preexisting rights."  NAI OB at 42; *Robotti & Co., LLC v. Liddell*, 2010 WL 157474, at *10 (Del. Ch. Jan. 14, 2010) ("Although it may seem as though the directors therefore received a benefit that did not accrue to the shareholders, this is a result of their pre-Offering (and otherwise unchallenged) contractual rights under the option agreements.").  Here, NAI's control rights had been threatened by the CBS Board

create a reasonable inference that Ms. Redstone received a unique benefit at the expense of the minority stockholders, necessitating an entire fairness review of the Merger.[209]

### 3. Plaintiffs Have Well-Pled the Merger Was Not Entirely Fair

Defendants do not seriously argue that Plaintiffs have failed to well-plead the Merger was not entirely fair, and for good reason. The Complaint alleges the NAI Parties relentlessly pursued the Viacom/CBS merger over many years, and through many roadblocks, including those placed on the road by Viacom and CBS fiduciaries who viewed the merger as unfavorable to their stockholders, all to allow Ms. Redstone to consolidate control and achieve what her father thought she could not achieve. The Viacom Committee proved unable (or unwilling) to overcome the will of Viacom's controller. It did not consider alternative transactions; it did not consider walking away when the CBS committee telegraphed that it viewed agreeing

---

historically. The consolidation of control in the 2019 Merger was an effort to prevent the CBS Board from usurping NAI's control in the future.

[209] The NAI Parties' singular focus on the fact that NAI's ability to influence Viacom and CBS, both as separate entities and as a combined entity, was not altered by the Merger ignores the bigger picture drawn by the Complaint. NAI OB at 44. As pled in the Complaint, the NAI Parties historically faced obstacles when seeking to exert control over the boards of CBS and Viacom. The consolidation of the two boards into one, comprised of a majority of directors that were selected by Ms. Redstone, coupled with the selection of a CEO for the combined company of Ms. Redstone's choosing, delivered benefits to the NAI Parties not shared by other Viacom stockholders. That the benefits to the NAI Parties came at a cost of ~$1 billion to Viacom, if proven, places the Merger in the realm of conflicted controller transactions that justify entire fairness review.

to Ms. Redstone's governance demands as a valuable "concession"; it did not insist on protections to neutralize the controller; it did not exploit Viacom's favorable trajectory and CBS's unfavorable trajectory during negotiations; it agreed to an exchange ratio that was significantly less favorable to Viacom stockholders (~$1 billion less favorable to be precise) than the exchange ratio both parties had agreed to when Viacom and CBS explored a merger just one year before; and it relied upon flawed market projections, rather than its own management's internal projections, when valuing the transaction.[210]  If these facts are true, and they are assumed to be at this stage, it is reasonably conceivable the Merger was not entirely fair.  Thus, the motion to dismiss as to the NAI Parties must be denied.

## B. The Complaint Well-Pleads Non-Exculpated Breach of Fiduciary Duty Claims Against the Viacom Committee Defendants (Count II)

Having determined that the breach of fiduciary claims against the NAI Parties are subject to entire fairness review, and that the Complaint well pleads that the Merger was not entirely fair, I turn next to the claims against the Viacom Committee Defendants.  Given that the Merger, at this stage, will be reviewed for entire fairness, there is some reflexive appeal to reviewing all claims against all Viacom fiduciaries arising out of the Merger under the entire fairness standard.[211]  But that is not how

---

[210] Compl. ¶¶ 201–219.

[211] *See, e.g.*, *In re Radiology Assoc., Inc. Litig.*, 1990 WL 67839, at *8 (Del. Ch. May 16, 1990) (noting that all defendants, controlling stockholders and directors alike, had

our law works. As our Supreme Court made clear in *In re Cornerstone Therapeutics, Inc. Stockholder Litigation*, entire fairness review for one does not mean entire fairness review for all:

> [T]o require independent directors to remain defendants solely because the plaintiffs stated a non-exculpated claim against the controller and its affiliates would be inconsistent with Delaware law and would also increase costs for disinterested directors, corporations, and stockholders, without providing a corresponding benefit. First, this Court and the Court of Chancery have emphasized that each director has a right to be considered individually when the directors face claims for damages in a suit challenging board action. And under Delaware corporate law, that individualized consideration does not start with the assumption that each director was disloyal; rather, independent directors are presumed to be motivated to do their duty with fidelity. . . . This Court has [] refused to presume that an independent director is not entitled to the protection of the business judgment rule solely because the controlling stockholder may itself be subject to liability for breach of the duty of loyalty if the transaction was not entirely fair to the minority stockholders.[212]

This is particularly so when breach of fiduciary claims against board members, like the claims against the Viacom Committee Defendants here, must be reconciled with the corporation's Section 102(b)(7) charter provision.[213]

---

conceded that the entire fairness standard of review applied to all claims of breach of fiduciary duty arising out of a cash-out merger initiated by a controlling stockholder).

[212] *In re Cornerstone Therapeutics, Inc. S'holder Litig.*, 115 A.3d 1173, 1182–83 (Del. 2015) (internal quotations omitted).

[213] *See id.* at 1185 ("Establishing a rule that all directors must remain as parties in litigation involving a transaction with a controlling stockholder would thus reduce the benefits that the General Assembly anticipated in adopting Section 102(b)(7).").

The Complaint alleges the members of the Viacom Committee, May, McHale, Nelson and Seligman, breached their fiduciary duties by favoring NAI's interests over those of Viacom's minority stockholders.[214] Here again, Plaintiffs draw heavily on Viacom's history, especially NAI's dogged attempts to force a Viacom/CBS merger over the initial resistance of both companies' fiduciaries, followed by their eventual submission.[215] In opposing the Viacom Committee Defendants' motion to dismiss, Plaintiffs urge the Court to consider the "constellation of facts" they have pled that attacks the independence (and good faith) of the Viacom Committee Defendants on three levels: (1) their "thick" personal relationships with Ms. Redstone; (2) their appreciation of, and reaction to, NAI and Ms. Redstone's demonstrated willingness to remove board members who did not march to the NAI rataplan; and (3) their failure to operate independently of NAI as reflected in their prioritizing Ms. Redstone's interests in the Merger over those of Viacom's minority stockholders.[216] After briefly reviewing the standards governing Plaintiffs' claims against these putatively exculpated Defendants, I address whether each category of factual allegations Plaintiffs have proffered to state non-exculpated claims against the Viacom Committee Defendants, either separately or collectively, do the job.

---

[214] Compl. ¶¶ 236–39.

[215] Compl. ¶¶ 1–13, 59–112, 116–17, 123–24, 167.

[216] *See generally* Pls.' Answering Br. at 52–66 (D.I. 100).

To state "a non-exculpated claim for breach of fiduciary duty against an independent director protected by an exculpatory charter provision," Plaintiffs must allege "facts supporting a rational inference that the director harbored self-interest adverse to the stockholders' interests, acted to advance the self-interest of an interested party from whom they could not be presumed to act independently, or acted in bad faith."[217] Plaintiffs do not allege the members of the Viacom Committee harbored some personal interest in the Merger. They do, however, allege the Viacom Committee Defendants lacked independence and acted in bad faith with respect to the Merger, and either allegation, if well pled, would be adequate to state a non-exculpated claim.[218]

"Independent directors are presumed to be motivated to do their duty with fidelity."[219] And each director must be afforded that presumption without regard to the conduct of his fellow directors, meaning, "[e]ach director has a right to be considered individually when the directors face claims for damages in a suit challenging board action."[220] With that said, if external factors compromise the independence or prompt bad faith conduct with respect to every director on a special

---

[217] *Cornerstone*, 115 A.3d at 1179–80.

[218] *Id.*

[219] *Id.* at 1182–83.

[220] *Id.* at 1182.

committee equally, and that influence is well pled, it follows that the court need not break down director-by-director how the external factor(s) influenced each director.

With the possibility of exculpation and the presumptions of independence and good faith in mind, I consider the adequacy of Plaintiffs' allegations against each of the Viacom Committee Defendants to determine if Plaintiffs have stated legally viable claims. For reasons that follow, I am satisfied that they have.

### 1. The Personal Relationships

When considering whether a Complaint states a reasonably conceivable basis to question the independence of a fiduciary based on that fiduciary's personal relationship with another fiduciary who has acted improperly for self-interest, the court "consider[s] all the particularized facts pled by the plaintiffs about the relationships between the director and the interested party in their totality and not in isolation from each other, and draw[s] all reasonable inferences from the totality of those facts in favor of the plaintiffs."[221] In other words, the court must consider "the full context of all the [pleaded] facts regarding a director's relationship to the

---

[221] *Del. Cty. Emps. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1019 (Del. 2015); *see also Sandys v. Pincus*, 152 A.3d 124, 128 (Del. 2016) ("Our law requires that all the pled facts regarding a director's relationship to the interested party be considered in full context in making the, admittedly imprecise, pleading stage determination of independence.").

interested party, and decide whether the relationship is of a bias-producing nature."[222]

As to May, McHale and Nelson, the Complaint's allegations regarding their respective personal relationships with Ms. Redstone (or NAI) are "thin."[223] Plaintiffs make much of the fact that May and Ms. Redstone have been neighbors, living "a mere five-minute walk away" from each other, for the last 26 years.[224] May, Ms. Redstone and Sumner Redstone also spent time on not-for-profit boards together.[225] McHale served as general counsel for MTV Networks in the mid-1980s, leaving the network two years prior to its acquisition by Viacom in 1987.[226] Nelson served as the Executive Vice President, CFO and director of Paramount

---

[222] *McElrath v. Kalanick*, 224 A.3d 982, 995 (Del. 2020) (alteration in original) (internal quotations omitted).

[223] It seems in Delaware's corporate law jurisprudence that certain words and phrases catch on as descriptive of particular points. In the director independence realm, our courts have taken to describing the "thickness" (or not) of the relationship between the target director and the interested director. *See Sanchez*, 124 A.3d at 1023–24 (discussing the "thickness of the relationship" between the clearly interested controller and members of the board of directors); *Amalgamated Bank v. Yahoo!*, 132 A.3d 752, at 784–85 (Del. Ch. 2016) (same); *In re PLX Tech., Inc. S'holders Litig.*, 2018 WL 5018535, at *43 (Del. Ch. Oct. 16, 2018) (same); *Lavin v. West Corp.*, 2017 WL 6728702, at *13 n.99 (Del. Ch. Dec. 29, 2017) (same).

[224] Compl. ¶¶ 26, 54–55.

[225] Compl. ¶ 26.

[226] Compl. ¶¶ 27, 54.

Communications, which Viacom acquired in 1994.[227] Nelson then served as the co-COO of DreamWorks SKG from 1994 to 2003, during which DreamWorks SKG and Paramount Pictures co-produced films.[228] When NAI cleaned house at Viacom following Sumner Redstone's departure, each of May, McHale and Nelson (and Seligman, as discussed below) were hand selected by Ms. Redstone to join the Viacom Board.

Standing alone, I agree with the Viacom Committee Defendants that none of these allegations reveal the kind of "thick" personal or professional relationship that would overcome the presumption that these fiduciaries have acted independently of the NAI Parties.[229] Thus, more is required and, as to May, McHale and Nelson, the analysis must continue.

As for Seligman's lack of independence based on her personal relationship with Ms. Redstone, Plaintiffs' allegations have more substance. Seligman was President of Sony Entertainment, Inc. and Sony Corporation of America—both long-

---

[227] Compl. ¶¶ 28, 54.

[228] *Id.*

[229] Defs. May, McHale, Nelson and Seligman's Opening Br. at 18–28 ("SCDOB") (D.I. 80); Defs. May, McHale, Nelson and Seligman's Reply Br. (D.I. 103) at 5–15; *see Beam v. Stewart*, 845 A.2d 1040, 1050 (Del. 2004) ("Allegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence.").

time customers of NAI.[230] Seligman and Ms. Redstone shared time on a not-for-profit board together and have been known to accompany one another to annual trade and professional events.[231] A *Wall Street Journal* reporter, Joe Flint, described Seligman and Ms. Redstone as "BFFs," and a *New York Post* reporter, Alexandra Steigrad, chronicled how Seligman had come to be considered Ms. Redstone's "closest advisor."[232] Evidencing their friendship, Ms. Redstone emailed Seligman to express her frustration with the CBS Board's resistance to NAI: "I need another you [for the CBS Board], but obviously it can't be you. . . . Miss you tons. . . . we can grab coffee next Friday . . . ."[233] As one would expect of close friends, Ms. Redstone was comfortable having Seligman spearhead the negotiations leading to the Merger, and Seligman personally provided Ms. Redstone with frequent updates throughout.[234] These allegations regarding the "thickness" of the personal relationship between Seligman and Ms. Redstone, standing alone, present a

---

[230] Compl. ¶ 29.

[231] Compl. ¶¶ 29, 55.

[232] Compl. ¶ 55 (citing, respectively, @JBFlint, Twitter (July 10, 2019), https://twitter.com/JBFlint/status/1148982061857824768, and Alexandra Steigrad, *The CBS-Viacom Merger Could Be a Few Months Away: Insiders*, N.Y. Post (Nov. 18, 2018), https://nypost.com/2018/11/18/the-cbs-viacom-merger-could-bea-few-months-away-insiders/).

[233] Compl. ¶ 55 (alteration in original).

[234] Compl. ¶¶ 29, 55, 74.

reasonably conceivable case that Ms. Seligman was not independent of the NAI Parties with respect to the Merger.

As noted, Plaintiffs' allegations regarding the Viacom Committee Defendants' personal relationships with Ms. Redstone are just one element of the "totality" of facts pled to support the reasonable inference that these directors lacked independence from the NAI Parties.[235] As discussed below, there is more.

### 2. Ms. Redstone and NAI's Demonstrated History of Ouster

Plaintiffs proffer a detailed account of NAI's three attempts to execute a Viacom/CBS combination in support of their claim that the Viacom Committee Defendants acted disloyally when negotiating and ultimately approving the Merger. As noted, Plaintiffs begin their account in 2016 by emphasizing that Ms. Redstone hand-picked May, McHale, Nelson and Seligman to serve on the Viacom Board following the contested ouster of Viacom Board members by NAI after the Viacom Board warned NAI not to attempt to undermine their independence.[236] In apparent recognition that May, McHale, Nelson and Seligman might face liability arising from the circumstances surrounding their appointment to the Viacom Board, NAI took the unusual step of agreeing to indemnify these directors for any such

---

[235] *Sanchez*, 124 A.3d at 1019.

[236] Compl. ¶¶ 52–54. Plaintiffs allege it is no coincidence that each of these directors would comprise the Viacom special committee each time NAI pushed for a Viacom/CBS merger. Compl. ¶¶ 61, 71.

liability.[237]   According to Plaintiffs, this unusual gesture set the stage for further

dominance.[238]

The Complaint alleges that NAI's retributive conduct was not reserved for the

Viacom Board; NAI came after the CBS Board as well when that board attempted

to prevent the 2018 merger attempt.[239]  According to Plaintiffs, NAI's tendency and

history of ouster "conceivably was not lost on members of the [Viacom Committee]

when they considered" NAI's third proposal for a Viacom/CBS merger.[240]

---

[237] Compl. ¶¶ 56–58.

[238] The Viacom Committee Defendants contend the mere fact a director was appointed to the board by an interested stockholder does not alone compromise that director's independence.  SCDOB at 15.  I agree.  *See McElrath*, 224 A.3d at 995 ("Importantly, being nominated or elected by a director who controls the outcome is insufficient by itself to reasonably doubt a director's independence because '[t]hat is the usual way a person becomes a corporate director.'" (quoting *Aronson v. Lewis*, 473 A.2d 805, 816 (Del. 1984))); *Calesa Assocs., L.P. v. Am. Capital, Ltd.*, 2016 WL 770251, at *11 (Del. Ch. Feb. 29, 2016) ("The Defendants correctly argue that '[t]he fact that an allegedly controlling stockholder appointed its associates to the board of directors . . . without more, does not establish actual domination.'" (alteration in original) (quoting *Primedia*, 67 A.3d at 258)).  But, to reiterate, there is more.

[239] Compl. ¶¶ 49–58, 99–106; *see also* Compl. ¶¶ 63–64 (alleging Ms. Redstone "reacted strongly to this rejection advising the CBS independent directors that 'the failure to get the deal done had caused Viacom to suffer' and made clear that her battle to merge CBS and Viacom was not over, stating 'the merger would get done 'even if [she had] to use a different process'" (alteration in original)).

[240] *Tesla I*, 2018 WL 1560293, at *15; *see also EZcorp*, 2016 WL 301245, at *41 (Del. Ch. Jan. 25, 2016) ("[W]hen controllers actually make retributive threats, that fact has legal significance."); *Tornetta*, 2019 WL 4566943, at *1 ("[I]n a transaction such as the one considered . . . the controlling shareholder will continue to dominate the company regardless of the outcome of the transaction. The risk is thus created that those who pass

In arguing that these allegations do not plead a reasonably conceivable basis to question their independence, the Viacom Committee Defendants maintain that Plaintiffs must couple their allegations relating to fear of removal with allegations that the Viacom directorships were "material" to each of these defendants.[241] That might be true if that is all Plaintiffs alleged. But threats of removal, even in circumstances where the directorship is not demonstrably material, cannot be ignored in the independence analysis. Indeed, "giving pleading-stage effect to a controller's actual threats and retributive behavior has important integrity-preserving consequences."[242] Thus, at the pleading stage, this Court can reasonably infer that "[a controlling stockholder's] willingness to take retributive action

---

upon the propriety of the transaction might perceive that disapproval may result in retaliation by the controlling shareholder." (quoting *Tremont II*, 694 A.2d at 428)).

[241] *Beam*, 833 A.2d at 978 ("What is required in addition are allegations demonstrating that remaining on [the] board is material to the outside directors such that they would be incapable of considering demand without this extraneous consideration having an inappropriate effect on their decisionmaking process."). *But cf. Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *32 (Del. Ch. Apr. 14, 2017) ("Although in theory a special committee of independent directors 'is best positioned to extract a price at the highest possible level because it does not suffer from the collective action problem of disaggregated stockholders,' the men and women who populate the committees are rarely individuals 'whose own financial futures depend importantly on getting the best price and, history shows, [they] are sometimes timid, inept, or . . . , well, let's just say worse.'" (alteration in original) (quoting *In re Cox Commc'ns, Inc. S'holders Litig.*, 879 A.2d 604, 619 (Del. Ch. 2005) (Strine, V.C.))).

[242] *EZcorp*, 2016 WL 301245, at *42.

affect[s] all of the directors."[243]   Plaintiffs have clearly alleged that NAI has a willingness to take such action, and this willingness, coupled with other facts, can reasonably be inferred to have affected the Viacom Committee Defendants' independence at the pleading stage.

### 3. The "Controlled Mindset"

As the final element of their pleading-stage lack of independence showing, Plaintiffs invoke the so-called "controlled mindset" reasoning first applied as such by this court in *In re Southern Peru Copper Stockholder Derivative Litigation*.[244] The gravamen of Plaintiffs' argument is that NAI dominated the Viacom Committee and its process, as evidenced by:

- The composition of the Viacom Committee, all of whom were NAI's hand-picked directors selected after disloyal board members were removed;[245]

- The Viacom Committee's obedient acceptance of NAI's direction that it would not consider a transaction other than a merger with CBS, and its reflexive rebuff of third-party interest in Viacom;[246]

- The Viacom Committee's submissive assumption that NAI's past resistance to conditioning the merger with CBS on the approval of a

---

[243] *Id.*

[244] *Southern Peru*, 52 A.3d at 798 ("From inception, the Special Committee fell victim to a controlled mindset and allowed [the controlling stockholder] to dictate the terms and structure of the Merger.").

[245] Compl. ¶¶ 52–54.

[246] Compl. ¶¶ 73, 77, 116–17, 123–24.

majority of Viacom's minority stockholders would remain NAI's position with respect to the Merger, thereby explaining its decision not to ask NAI to agree to this protection for minority stockholders;[247]

- The Viacom Committee's decision not to seek a collar on the deal price or other minority protections (such as the ability to effect a change in recommendation tied to a stock price drop), even though NAI insisted that the Merger be structured as stock-for-stock and even though due diligence revealed that Viacom was significantly outperforming CBS;[248]

- NAI's dominance of the Viacom Committee's negotiation strategy, including that the Viacom Committee allowed NAI to insist on nailing down NAI's governance demands, principally Bakish's placement as CEO, before the Viacom Committee could negotiate the economics of the deal in earnest;[249]

- The Viacom Committee's refusal to pivot and focus on economics when the CBS special committee made clear that it would deem its agreement to NAI's governance demands as a valuable and "significant concession," meaning Viacom would have to pay for NAI to achieve its governance goals;[250] and

- The Viacom Committee's refusal to exploit the negotiating leverage Viacom's management had given it by electing to ignore the favorable, reliably prepared Viacom management projections and, instead, rely only upon consensus analyst estimates when negotiating with the CBS special committee and when valuing the transaction (even after the Viacom Committee's financial advisors demonstrated that using consensus estimates for both companies

---

[247] Compl. ¶¶ 123, 182, 202–04.

[248] Compl. ¶¶ 209, 211.

[249] Compl. ¶¶ 119–21, 167, 181–85.

[250] Compl. ¶ 183.

would artificially overstate CBS's value to the detriment of Viacom).[251]

When analyzing director independence in the presence of a controlling stockholder, "the focus . . . is on domination of the board with regard to the transaction at issue."[252] This inquiry is not one size fits all; rather, "it is a highly fact specific inquiry" with "no magic formula to find control."[253] When engaging in this inquiry at the pleading stage, the court "does not take an unduly restrictive view of the avenues through which a controller obtains corporate influence."[254]

"[W]hether [the Viacom Committee Defendants] were controlled is an issue of fact which must, at this stage, be determined from an examination of the well-pled facts in the Complaint."[255] As the Court considers the totality of this

[251] Compl. ¶¶ 166, 168–78.

[252] *Crimson*, 2014 WL 5449419, at *16.

[253] *Calesa*, 2016 WL 770251, at *11; *see also* Usha Rodrigues, *The Fetishization of Independence*, 33 J. Corp. L. 447, 465 (2008) ("*The Fetishization of Independence*") ("Delaware courts examine a director's behavior as an indicator of independence, creating a contextual approach--rather than looking only to rigid proxies like the lack of a familial or financial relationship--in gauging the lack of improper influence or conflicts of interest.").

[254] *In re Zhongpin Inc. S'holders Litig.*, 2014 WL 6735457, at *8 (Del. Ch. Nov. 26, 2014), *rev'd sub nom. on other grounds*, *Cornerstone*, 115 A.3d 1173.

[255] *Calesa*, 2016 WL 770251, at *11; *see also The Fetishization of Independence*, at 478 ("[T]he independence of directors is evaluated not just in terms of their lack of ties with the acquirer, but also in terms of their behavior. Delaware courts conduct a fact-intensive ex post inquiry into the special committee's actions.").

Complaint's allegations of domination and control, it must remain mindful that "[a] controlling stockholder occupies a uniquely advantageous position for extracting differential benefits from the corporation at the expense of minority stockholders,"[256] creating a risk "that those [directors] who pass upon the propriety of the transaction might perceive that disapproval may result in retaliation by the controlling shareholder."[257] In this regard, "[e]ven an independent, disinterested director can be dominated in his decision-making by a controlling stockholder,"[258] resulting in directors who are "more independent in appearance than in substance."[259] When the court determines that the pled facts allow a reasonable inference that a board's (or special committee's) independence has been "sterilized" by the domination of a controller, "[t]his determination, in turn, is sufficient to rebut the business judgment rule with respect to actions of the Board.'"[260]

---

[256] *EZcorp*, 2016 WL 301245, at *11.

[257] *Id.* at *11–12 (citing *Tremont II*, 694 A.2d at 428); *id.* at *20 (noting when a controller is interested in consummating a transaction "there is a risk of coercion" (citing, in turn, *Citron*, 584 A.2d at 502)). *Cf. Tesla I*, 2018 WL 1560293, at *16 (discussing how the controller brought the transaction proposal "to the Board not once, not twice, but three times" and led the Board's discussions regarding the transaction, making it appropriate to consider "whether [the controller] brought with him into the boardroom the kind of influence that would support a reasonable inference that he dominated the Board's decision-making with regard to the Acquisition").

[258] *Tesla I*, 2018 WL 1560293, at *17.

[259] *EZcorp*, 2016 WL 301245, at *21 (quoting *Cox*, 879 A.2d at 619).

[260] *Calesa*, 2016 WL 770251, at *11.

After carefully reviewing the Complaint, I am satisfied Plaintiffs have pled sufficient facts to meet the "low 'reasonable conceivability' standard of Rule 12(b)(6)" with respect to the controlled mindset of the Viacom Committee.[261] Specifically, it is reasonably conceivable that the Viacom Committee Defendants allowed NAI's influence over them to impede their role in disabling NAI's self-interest and ensuring that the best interests of all Viacom stockholders were loyally represented in the negotiation and consummation of the Merger.[262] In reaching this conclusion, I have "focus[ed] on how the [Viacom Committee] actually negotiated the deal . . . rather than just how the committee was set up."[263] As pled, the Viacom Committee's negotiations reflect a desire to placate the controller, not to land the

---

[261] *Id.*

[262] *See EZcorp*, 2016 WL 301245, at *21 (emphasizing the crucial role of an effective special committee in disabling the controller's influence); *Tornetta*, 2019 WL 4566943, at *12 ("*MFW* provides a roadmap that allows fiduciaries to engage in conflicted controller transactions worthy of pleadings stage business judgment deference. In the conflicted controller context, in particular, *MFW*'s 'dual protections' are meant to 'neutralize' the conflicted controller's 'presumptively coercive influence' so that judicial second-guessing is no longer required." (quoting *Rouse*, 2018 WL 1226015, at *1))).

[263] *Southern Peru*, 52 A.3d at 789; *see also Tremont II*, 694 A.2d at 429 (stating a special committee must "function in a manner which indicates that the controlling shareholder did not dictate the terms of the transaction and that the committee exercised real bargaining power at 'an arms-length'").

best transaction possible for all Viacom stockholders.[264]  Thus, Plaintiffs have well

pled that the Viacom Committee operated under a controlled mindset.[265]

*   *   *   *   *

---

[264] In other words, the Viacom Committee Defendants "allowed themselves to be hemmed in by the controlling stockholder's demands," placing them "in a world where there was only one strategic option to consider, the one proposed by the controller, . . . [thus creating] a dynamic where at best [the committee] had two options, either figure out a way to do the deal the controller wanted or say no." *Southern Peru*, 52 A.3d at 763, 801; *see also Frederick Hsu Living Tr.,* 2020 WL 2111476, at *35 (noting that a special committee that was dominated by a controlling stockholder "seemed less intent on negotiating with [the controller] and more interested in achieving the result that [the controller] wanted"). Importantly, in the context of the controlled mindset analysis, the question of why the Viacom Committee Defendants were not independent or acted disloyally ultimately is of no consequence; it is enough that the facts as pled support a reasonable inference that each member was unable or unwilling to resist NAI's influence. *In re Oracle Corp. Deriv. Litig.*, 2018 WL 1381331, at *11 (Del. Ch. Mar. 19, 2018) ("'[t]he reason for the disloyalty (the faithlessness) is irrelevant[;] the underlying motive (be it venal, familial, collegial, or nihilistic) for conscious action not in the corporation's best interest does not make it faithful, as opposed to faithless.'" (alterations in original) (quoting *Guttman v. Huang*, 823 A.2d 492, 506 n.34 (Del. Ch. 2003))).

[265] The Viacom Committee Defendants counter that *Southern Peru* offers no authority for denying their motion to dismiss since the members of the special committee in that case were dismissed at the summary judgment stage for lack of evidence supporting a non-exculpated claim.  Arg. and Ruling on Cross-Mots. for Summ. J., C.A. No. 961–VCS, at 123–29 (Del. Ch. Dec. 21, 2010) (TRANSCRIPT).  At first glance, the Viacom Committee Defendants appear to make a valid point.  On closer inspection of the briefs and oral argument, however, it is clear that the plaintiffs in *Southern Peru* simply did not raise the controlled mindset argument at the summary judgment stage, nor did they even challenge the special committee directors' independence.  It is, therefore, impossible to predict how the court might have ruled on the special committee's motion for summary judgment had the controlled mindset argument been on the table.  The court's comments about the special committee's conduct post-trial suggest the controlled mindset argument may have had traction at summary judgment had it been made.

The Complaint well-pleads that each member of the Viacom Committee knew Ms. Redstone personally outside of Viacom. The fact that Ms. Redstone chose to appoint the members of the Viacom Committee to the Viacom Board following the contentious removal of directors she viewed as disloyal suggests her personal relationship with these hand-picked directors was "thicker" than may first appear. As for Seligman, there is no need to suggest; the pled facts reveal a close personal relationship of a nature that allows an inference that Seligman's loyalties would run to Ms. Redstone over Viacom. The Complaint's allegations regarding the Viacom Committee Defendants' personal relationships with Ms. Redstone, the circumstances of their appointments to the Viacom Board and the Viacom Committee, their knowledge of NAI's past retributive behavior, and their actions as special committee members that reasonably infer a controlled mindset, taken together, sufficiently plead reasonably conceivable breaches of the duty of loyalty on the part of each Viacom Committee Defendant.[266]

## C. The Complaint Fails to State a Breach of Fiduciary Duty Claim Against Bakish (Count III)

---

[266] *Cornerstone*, 115 A.3d at 1186–87 (noting that "when a complaint pleads facts creating an inference that seemingly independent directors approved a conflicted transaction for improper reasons, and thus, those directors may have breached their duty of loyalty, the pro-plaintiff inferences that must be drawn on a motion to dismiss counsels for resolution of that question of fact only after discovery").

Regardless of the standard of review, to plead a viable claim of breach of fiduciary duty, Plaintiffs must allege "sufficiently detailed acts of wrongdoing" to place the defendant on notice of what he purportedly did wrong.[267] Plaintiffs appear to offer only three criticisms of Bakish, each of which falls far short of pleading actionable wrongdoing.

*First*, Plaintiffs allege that Bakish kept Ms. Redstone informed of all major Viacom decisions.[268] Importantly, Plaintiffs do not allege that Bakish was involved in substantive negotiations or otherwise was a part of the Viacom Committee's process leading to the Merger. While Ms. Redstone's effort to curry favor with Bakish in order to enlist his assistance in connection with a merger she was contractually barred from pursuing is troubling, the Complaint does not allege that Bakish was bound by the 2018 settlement agreement or that he had any basis under the circumstances to resist Ms. Redstone's requests for information.

*Second*, it is alleged that Ianniello contacted Bakish with regard to restarting the negotiation process leading to the Merger, and that Bakish responded to Ianniello

---

[267] *Gantler v. Stephens*, 965 A.2d 695, 709 (Del. 2009); *see also VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 611 (Del. 2003) (noting that, under Chancery Rule 8(a), a complaint must "give the defendant fair notice of a claim"); *In re Coca-Cola Enters., Inc.*, 2007 WL 3122370, at *4 n.28 (Del. Ch. Oct. 17, 2007) ("Plaintiffs need not offer prolix tales of abuse belabored by needless details, but plaintiffs must allege *facts* sufficient to show that the legal elements of a claim have been satisfied.").

[268] Compl. ¶ 67.

by suggesting that the financial and legal advisors to each special committee should engage regarding potential terms of a transaction.[269] In this regard, Bakish did exactly what he was supposed to do: when approached by CBS's CEO, Bakish informed him that the respective special committees and their advisors should engage. There is no actionable wrongdoing there.

*Finally*, Plaintiffs allege Bakish met with four members of the CBS special committee after NAI and Viacom insisted that Bakish lead the combined company as CEO.[270] As alleged, during this meeting, the CBS special committee advised Bakish that the two special committees would have to agree on governance before CBS would be willing to discuss the exchange ratio.[271] There is no allegation that, from here, Bakish attempted to influence the Viacom Committee's negotiation strategy or otherwise attempted to steer Viacom into pushing for his role as CEO of the combined company at the expense of economic consideration for Viacom's stockholders. All that is alleged is that Bakish was asked to meet with the CBS special committee and agreed to take that meeting. He then relayed the substance of the meeting to the Viacom Committee and that committee took it from there.

---

[269] Compl. ¶ 119.

[270] Compl. ¶ 184.

[271] *Id.*

None of these allegations implicate any fiduciary breaches or other actionable wrongdoing by Bakish. Indeed, from the Complaint's narrative, it would appear that Bakish refrained from inserting himself into the process and deliberately chose not to flaunt his power as chief executive. Again, there is no claim of actionable wrongdoing pled here.

## III. CONCLUSION

For the foregoing reasons, the Motion to Dismiss is DENIED as to Counts I and II of the Complaint, asserting claims for breach of fiduciary duty against the NAI Parties and the Viacom Committee Defendants, respectively. The Motion is GRANTED as to Count III, which purports to assert a claim for breach of fiduciary duty against Bakish.

**IT IS SO ORDERED.**